**A.M. GOLLOMP and Peter Stuyvesant, Ltd.**

v.

**MNC FINANCIAL, INC., et al.**

**Lenny B. ROBINSON**

v.

**MNC FINANCIAL, INC., et al.**

**Murray ZUCKER and Ivan Tellis**

v.

**MNC FINANCIAL, INC., et al.**

**Civ. Nos. JFM–90–1117, JFM–90–1209, JFM–90–1319.**

United States District Court, D. Maryland.

Jan. 10, 1991.

George Church, Church & Houff, P.A., Baltimore, Md., Richard Greenfield, Greenfield & Chimicles, Haverford, Pa., Arnold Levin, Levin, Fishbein & Sedran, Philadelphia, Pa., Jules Brody, Stull, Stull & Brody, New York City, for A.M. Gollomp.

R. Thomas Radcliffe, Jr., Church & Houff, Baltimore, Md., David Brower, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, for Lenny B. Robinson.

Irving Dross, Dross & Levenstein, Waldorf, Md., Stull, Stull & Brody, Joseph Weiss, New York City, for Murray Zucker.

Irvin Nathan, Washington, D.C., John Lewin, Jr., Venable, Baetjer & Howard, Baltimore, Md., for MNC Financial, Inc.

## MEMORANDUM

MOTZ, District Judge.

These three consolidated actions are brought by five shareholders of MNC Financial, Inc. ("MNC") against MNC and its former chairman and chief executive officer, Alan P. Hoblitzell, Jr. Seeking to represent a class of all persons who purchased MNC stock between January 17, 1989 and July 24, 1990, plaintiffs assert federal securities law claims and a claim for the common law tort of negligent misrepresentation. Defendants have filed a motion to dismiss.

### I.

On April 19, 1990, MNC announced a substantial increase of loan loss reserves in the first quarter of 1990 because of problems which it was experiencing with its real estate loan portfolio. The following day the first of these actions (Civil No. 90–1117) was instituted. The other two actions (Civil No. 90–1209 and Civil No. 90–1319), were filed soon thereafter, on May 1, 1990 and May 15, 1990, respectively.

The plaintiffs in the various actions were represented by different lawyers, and a battle immediately broke out among them as to who should be designated as "lead counsel" for the class whom all of the plaintiffs purport to represent. By a letter order dated September 27, 1990, I ruled that the lawyers who filed the first action should be designated as lead counsel. They subsequently filed a consolidated complaint on behalf of all of the named plaintiffs. The allegations in the consolidated amended complaint may be summarized as follows.

MNC (a bank holding company headquartered in Baltimore) made a number of real estate loans concentrated in the Baltimore–Washington area during the 1980s. In 1988 and 1989 this lending strategy appeared to pay off as MNC reported robust earnings. These reported earnings were fundamentally misleading, however, since MNC was able to post them only by concealing the deterioration of its real estate portfolio.

During 1988 and 1989, according to the allegations on the consolidated complaint, MNC knew that many of its real estate loans were unlikely to perform. Nevertheless, MNC failed to set aside appropriate loan loss reserves. To the contrary, it touted its loan portfolio as healthy and the Baltimore–Washington real estate market as fundamentally sound. As a result of its failure to set aside adequate loan loss reserves, MNC reported inflated earnings in its quarterly and annual reports in 1988 and 1989. In addition, throughout 1988

and 1989, MNC stated in various public announcements that it followed conservative lending policies and used a risk rating system for the purpose of implementing that policy.

MNC merged with Equitable Bancorporation, another Baltimore bank holding company, in January 1990. The boards of both MNC and Equitable recommended the merger to their shareholders as, *inter alia,* a means to cut costs. In fact, however, MNC pursued the merger because it offered additional capital to shore up MNC's deteriorating position.

On April 19, 1990 MNC finally acknowledged that its real estate loan portfolio was in trouble. It announced that it was increasing its loan loss reserves and, as a result, its earnings dropped precipitously. In contrast to strong earnings in 1988 and 1989, MNC posted only a small profit in the first quarter of 1990 and lost $75 million in the second quarter of 1990. In the wake of these developments, MNC's stock price stood at $8.88 on August 6, 1990, down from a price of $22 several months earlier.

## II.

Count I of the consolidated complaint is brought under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5 (1990). Relying principally upon three circuit court opinions, *DiLeo v. Ernst & Young,* 901 F.2d 624 (7th Cir.1990); *Christidis v. First Pa. Mortgage Trust,* 717 F.2d 96 (3d Cir.1983); and *Denny v. Barber,* 576 F.2d 465 (2d Cir.1978), defendants contend that Count I fails to state a claim upon which relief can be granted and that, alternatively, plaintiffs have failed to allege fraud with sufficient particularity under Fed.R.Civ.P. 9(b).[1] Plaintiffs, relying upon several district court opinions, *see, e.g., In re Midlantic Corp. Shareholder Litigation,* No. 90–1275 (DRD), —— F.Supp. —— (D.N.J. Oct. 9, 1990); *Nicholas v. Poughkeepsie Sav. Bank,* [1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) para. 95,606, 1990 WL 145154 (S.D.N.Y. Sept. 26, 1990), argue that *DiLeo, Christidis* and *Denny* are distinguishable or that they were wrongly decided.

■ In *DiLeo,* the most recent case cited by defendants, the court stated:

> Securities laws do not guarantee sound business practices and do not protect investors against reverses. When a firm loses money in its business operations, investors feel the loss keenly. Shifting these losses from one group of investors to another does not diminish their amplitude, any more than rearranging the deck chairs on the Titanic prevents its sinking. Revealing the bad loans earlier might have helped the DiLeos, but it would have injured other investors by an equal amount. The net is a wash.

901 F.2d at 627 (citations omitted). This language can be read as suggesting that a bank's failure to maintain adequate loan loss reserves can never give rise to a § 10(b) claim. If that is what the court intended, I respectfully disagree with its conclusion.[2] Although the securities laws do not protect investors against reverses, their very purpose is to protect investors against fraud. If it can be proven that bank officers fraudulently overstated the bank's earnings at a particular time (by failing to provide adequate loss reserves or otherwise), they certainly are personally liable for their conduct. They cannot con-

---

1. Several district court opinions also support defendants' position. *See, e.g., Wilkes v. Heritage Bancorp, Inc.,* Civ. No. 90–11151–F, 1990 WL 263612 (D.Mass. Nov. 21, 1990) (magistrate's report and recommendation); *Globerson v. First Interstate Bancorp.,* No. CV 88–5732 (C.D.Cal. Aug. 27, 1990).

2. The "shifting loss" issue addressed in *DiLeo* does, however, draw into question the propriety of certifying a class of investors who purchased stock over an extended period of time. To the extent that it is alleged that loan loss reserves

should have been increased (and reports of earnings correspondingly decreased) at different times within the class period, irreconcilable conflicts would seem to exist among different class members. *But cf. Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976) (allowing certification despite analogous problems); *Green v. Wolf Corp.,* 406 F.2d 291 (2d Cir.1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969).

done their actions by saying that they were merely trying to help one group of investors at the expense of another. Furthermore, to the extent that the stock of investors who purchased their shares before the fraud was committed is diminished in value by a recovery made in a fraud action against the bank by persons who purchased their shares in reliance upon a fraudulent misrepresentation, no injustice has been done. To the contrary, this is precisely what fraud and corporate law contemplates should occur. The loss is simply "shifted" from persons who were defrauded to persons who were not, and who, by virtue of their equity investment, were the owners of the bank at the time the fraud occurred.

Apparently agreeing with this reasoning, defendants here eschew a broad reading of *DiLeo*. Instead, they argue that the fallacy in the consolidated complaint is that plaintiffs have failed to state facts from which it can be properly inferred that defendants' alleged failure to maintain adequate loan loss reserves was fraudulent. They rely upon the principles that mere mismanagement and/or the making of faulty economic prognostications do not give rise to § 10(b) liability. *See, e.g., Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 117 (2d Cir.1982); *Polin v. Conductron Corp.*, 552 F.2d 797, 805 (8th Cir.1977), *cert. denied*, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977). These principles are well established and are not disputed by plaintiffs.

Since defendants acknowledge that a fraudulent failure to maintain adequate loan loss reserves may be actionable under § 10(b) and since plaintiffs concede that mismanagement and/or erroneous economic prognostication standing alone do not constitute fraud, there is no real dispute between the parties as to the substantive rule of law which governs. At oral argument both sides accepted my proposed formulation that plaintiffs are required to plead sufficient facts to support a conclusory averment that "defendants' failure to increase the loan loss reserves did not merely constitute the exercise of poor banking judgment but was so lacking in factual basis that it necessarily resulted either from a deliberate intent to defraud or a reckless disregard for the truth." [3]

█ The consolidated complaint does not itself precisely identify the facts which plaintiffs allege demonstrate fraud as opposed to mere mismanagement or faulty economic prognostication. At oral argument plaintiffs identified three such facts: (1) the substantial increase in the loan loss reserves which MNC announced on April 19, 1990; (2) the substantial decrease in the value of MNC stock since the April 19, 1990 announcement; and (3) the allegedly inherent contradiction between MNC's representations that it is conservatively managed and the deterioration of its loan portfolio.

None of these facts are sufficient to support the conclusory averment that defendants acted fraudulently, *i.e.* that they did something more than mismanage the affairs of the bank or err in projecting the performance of its loans. The need to make a substantial increase in loan loss reserves at a given time may, at the least, derive as much from mismanagement as from fraud. The decrease in the value of MNC stock which has occurred merely reflects the marketplace's evaluation of MNC's financial plight and does not itself evidence fraud in any way. Likewise, assuming that defendants' self-characterization of "conservative management" constitutes the type of misrepresentation which can give rise to a § 10(b) claim, the fact that loans fail does not itself demonstrate that they constituted unacceptable risks when they were made. It may well

---

**3.** The one caveat which defendants placed upon the accuracy of this formulation is that the Supreme Court has not yet expressly decided whether recklessness satisfies the scienter element of a § 10(b) claim. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). However, the vast majority of the circuits have so held. *See Van Dyke v. Coburn Enters., Inc.*, 873 F.2d 1094, 1100 (8th Cir.1989) (collecting cases); *cf. Colonial Lincoln–Mercury, Inc. v. Musgrave*, 749 F.2d 1092, 1098 (4th Cir.1984).

be that their default is attributable to a general economic downturn in MNC's lending area.[4]

The sufficiency of plaintiffs' pleading must be assessed against the background of the purposes of the requirement of Fed. R.Civ.P. 9(b) that "the circumstances constituting fraud ... shall be stated with particularity." There are three such purposes: "(1) to provide a defendant with fair notice of the plaintiff's claim, (2) to protect the defendant from harm to his or her reputation or good will, and (3) to reduce the number of strike suits." *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); *accord New England Data Servs. v. Becher*, 829 F.2d 286, 289 (1st Cir.1987).

The allegations here are sufficient to meet the first of these purposes. They are particular enough to put defendants on fair notice of plaintiffs' claims and to enable them to frame a responsive pleading. However, the most that can be said about the allegations is that they provide a basis for a suspicion that defendants acted fraudulently within the meaning of the securities laws. To permit this case to proceed further solely on the basis of such a suspicion would itself damage defendants' reputation and good will.

Moreover, this is a classic strike suit, as demonstrated by (1) the fact that it was initially instituted by a form complaint filed the day after MNC made its April 19, 1990 announcement increasing its loan loss reserves, and (2) the unseemly preliminary dispute concerning who would be appointed to serve as plaintiffs' "lead counsel." It is thus precisely the kind of suit which Rule 9(b) requires to be scrutinized with great care. As the Supreme Court has recognized, securities litigation "presents a danger of vexatiousness different in degree and kind from that which accompanies litigation in general," *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739, 95 S.Ct. 1917, 1927, 44 L.Ed.2d 539 (1975), and

provides "the potential for nuisance or 'strike' suits" whose "very pendency ... may frustrate or delay normal business activity of the defendant which is totally unrelated to the lawsuit." *Id.* at 740, 95 S.Ct. at 1927.

██ I recognize the dilemma which plaintiffs face. They contend that they believe that fraud has occurred but that the information which would prove that fraud is exclusively within the possession of defendants. There are, however, two answers to this contention. First, to the extent that fraud has occurred and plaintiffs cannot by the exercise of reasonable diligence uncover it, the statute of limitations will not expire until three years from the date they purchased MNC stock. *See O'Hara v. Kovens*, 625 F.2d 15 (4th Cir. 1980), *cert. denied*, 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981) (holding that § 10(b) and Rule 10b–5 cases in Maryland are governed by the limitations period in Md. Corps. & Ass'ns Code § 11–703(f) (1985)); *cf. Morley v. Cohen*, 610 F.Supp. 798 (D.Md.1985) (same; holding also that the federal equitable tolling doctrine is unavailable in this context). If within those three years information comes to light by virtue of suits filed by public agencies, other private litigation, or otherwise, this action can be re-instituted. Second, the predicament confronting plaintiffs is created by the balance of competing policy interests which Rule 9(b) strikes. Perhaps there may be cases where fraudulent conduct is not remedied because it remains undiscovered. But if that be so it is precisely because Rule 9(b) (following the traditions both of the common law and of code pleading) mandates that fraud cannot be alleged merely on the basis of suspicion and that a fraud suit cannot itself be the vehicle for initially uncovering the fraud.

### III.

██ One of the plaintiffs (Marshall Wolf) owned Equitable Bancorporation

---

**4.** Recognizing the dubiousness of a fraud claim based upon a general representation of "conservative management," plaintiffs contend that defendants made the more specific misrepresentation that MNC followed certain loan review procedures which were conservative in nature.

However, at oral argument plaintiffs conceded that they are not in possession of any specific information indicating that the procedures were not followed and that they only speculate that the procedures must not have been followed because of the failure of the loans.

stock which was exchanged for MNC stock when the two banks merged. He asserts a claim on behalf of himself and other Equitable shareholders under §§ 11, 12 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*, 77*o*, and § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a). This claim is based upon statements made in a Joint Proxy Statement and Prospectus which MNC and Equitable filed with the Securities and Exchange Commission in connection with their proposed merger. All of the statements to which Wolf points pertained to the views expressed by the boards of directors of MNC and Equitable that the merger was fair, in the best interest of the stockholders of each bank and a positive step for each institution. Wolf has not identified a single fact demonstrating or suggesting that the boards did not hold the views which were stated. Accordingly, no allegation has been made of a false or misleading statement giving rise to a securities law violation.

Count III of the complaint seeks relief under §§ 11, 12, and 15 of the Securities Act of 1933 in connection with allegedly false and misleading statements in documents relating to MNC's Dividend Reinvestment Plan ("DRIP"). The plaintiffs have failed, however, to provide any factual context for this allegation whatsoever. Indeed, the complaint barely mentions the DRIP at all, and the plaintiffs shed no additional light on this matter at oral argument. Thus, the plaintiffs have failed to state a claim for relief concerning the DRIP.

Plaintiffs' final claim is for the common law tort of negligent misrepresentation. Plaintiffs have not and apparently cannot allege diversity jurisdiction. Since I am dismissing plaintiffs' federal securities law claims, there is no basis for me to exercise

pendent jurisdiction over the state law claim, and it too will be dismissed.

A separate order effecting the rulings made in this memorandum is being entered herewith.[5]

### ORDER

For the reasons stated in the memorandum entered herein, it is this 10th day of January 1991

ORDERED that

1. Defendants' motion to dismiss is granted; and

2. Plaintiffs' claims are dismissed without prejudice.

---

5. Plaintiffs have not sought leave to file a further amended complaint. If they sought such leave, I would deny it since plaintiffs have already been given the opportunity to file one amendment (in the form of the consolidated complaint) and since at oral argument they were unable to articulate any specific factual

bases for their averment of fraud. *See Denny v. Barber,* 576 F.2d 465, 471 (2d Cir.1978). However, since plaintiffs should be permitted to pursue their claims if they subsequently learn information which would support their allegations of fraud, the present dismissal will be without prejudice.