William R. HERSHEY

v.

MNC FINANCIAL, INC., et al.

Marshall WOLF

v.

MNC FINANCIAL, INC., et al.

Alfred ASCH and David Asch

v.

MNC FINANCIAL, INC., et al.

Civ. Nos. JFM–90–3151, JFM–91–684 and JFM–91–1208.

United States District Court,
D. Maryland.

Aug. 19, 1991.

**368**

Steven J. Toll, Cohen, Milstein, Hausfeld & Toll, Washington, D.C., Edward Houff, Church and Houff, Baltimore, Md., for William Hershey, et al.

Robert Kershaw, Quinn, Ward & Kershaw, Baltimore, Md., for Marshall Wolf.

Richard Radcliffe, Jr., Baltimore, Md., Richard Greenfield, Greenfield and Ceimicles, Haverford, Pa., for Alfred Asch, et al.

William Utermohlen, Alexander E. Bennett, Arnold and Porter, Washington, D.C., Benjamin Civilletti, Venable, Baetjer & Howard, Baltimore, Md., for MNC Financial, Inc., et al.

## MEMORANDUM

MOTZ, District Judge.

In *Gollomp v. MNC Financial, Inc.*, 756 F.Supp. 228 (D.Md.1991), I dismissed three consolidated actions brought by five shareholders of MNC Financial, Inc. ("MNC") against MNC and its former chairman and chief executive officer, Alan P. Hoblitzell, Jr. Plaintiffs in those actions sought to assert (on behalf of all persons who purchased MNC stock between January 17, 1989 and July 24, 1990) federal securities law claims and a claim for the common law tort of negligent misrepresentation. I dismissed the actions without prejudice, essentially on the ground that plaintiffs had failed to allege fraud with sufficient particularity pursuant to Fed.R.Civ.P. 9(b). Plaintiffs noticed an appeal from my decision but subsequently dismissed it.

Presently pending before me are three additional actions brought by MNC shareholders against MNC, Hoblitzell and several other former officers and directors of MNC asserting claims substantially similar to those previously asserted in *Gollomp*. In *Hershey v. MNC*, Civil No. 90-3151, plaintiffs seek to represent all persons who purchased MNC stock between January 18, 1990 and October 25, 1990. In *Wolf v. MNC*, Civil No. 91-684, plaintiff seeks to represent all persons who were owners of the common stock of Equitable Bancorporation ("Equitable") on January 18, 1990, when MNC and Equitable merged. In *Asch v. MNC*, Civil No. 91-1208, plaintiffs seek to represent all persons who purchased MNC stock between January 17, 1989 and October 25, 1990.[1] Defendants have filed motions to dismiss in all three actions.

## I.

These actions arise out of a dramatic decrease in the reported earnings of MNC during 1990 as a result of substantial increases which it made to its loan loss reserves because of its deteriorating real estate loan portfolio. This decrease in earnings caused a precipitous drop in the value of MNC's common stock during the class

---

1. There are substantial overlaps between plaintiffs and their counsel in the presently pending cases and the earlier *Gollomp* case. Wolf, the plaintiff in Civil No. 91-684, was himself a plaintiff in the *Gollomp* case, and his present counsel appeared as subsidiary counsel on behalf of plaintiffs in *Gollomp*. Some of the plaintiffs in *Hershey* are represented by lawyers who likewise appeared as subsidiary counsel in *Gollomp*, and plaintiffs' counsel in *Asch* were lead counsel in *Gollomp*.

periods. Plaintiffs allege that during those periods MNC and its representatives announced inflated earnings reports (because of understated loan loss reserves) and made various other misrepresentations to the investing public.

In *Gollomp* both sides agreed that under Fed.R.Civ.P. 9(b) "plaintiffs are required to plead sufficient facts to support a conclusory averment that 'defendants' failure to increase the loan loss reserves did not merely constitute the exercise of poor banking judgment but was so lacking in factual basis that it necessarily resulted either from a deliberate intent to defraud or a reckless disregard for the truth.'" 756 F.Supp. at 231. Plaintiffs identified three facts which they contended demonstrated fraud as opposed to mere mismanagement or faulty prognostication: (1) the substantial increase in the loan loss reserves which MNC announced on April 19, 1990; (2) the substantial decrease in the value of MNC stock after the April 19, 1990 announcement; and (3) the allegedly inherent contradiction between MNC's representations that it was conservatively managed and the deterioration of its loan portfolio. I held that these facts, considered individually or collectively, were not sufficient to support plaintiffs' conclusory averment that defendants acted fraudulently.

In the present cases plaintiffs, arguing that Rule 9(b) should be interpreted very liberally (or not applied at all) to claims arising under the federal securities laws,[2] invite me to reverse my ruling in *Gollomp*. Continuing to believe that *Gollomp* was correctly decided, I decline the invitation. Plaintiffs further argue that assuming the correctness of my ruling in *Gollomp*, they have now pled sufficiently detailed facts to meet its requirements. They also contend, as did plaintiffs in *Gollomp*, that Rule 9(b) does not apply to claims which they have asserted under §§ 11, 12 and 15 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§ 77k, 77*l* and 77*o*, and § 14(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78n(a), in connection with MNC's Dividend Reinvestment Plan ("DRIP") and the MNC/Equitable merger.

## II.

The complaint in *Asch* is the broadest in temporal scope and, to the extent that it overlaps in time with the complaints in *Hershey* and *Wolf,* is virtually identical to them. Therefore, it provides the most convenient basis for summarizing plaintiffs' allegations.

### A. MNC's Alleged Misrepresentations

MNC is a bank holding company headquartered in Baltimore. It made a number of real estate loans concentrated in the Baltimore–Washington area in the 1980s. This strategy appeared to pay off as MNC posted healthy earnings through 1989. MNC's real estate loan portfolio was, however, fundamentally unsound. Prompted by stiff competition in the lending market and a desire to realize short-term gains, MNC had funded a variety of ill-conceived real estate projects in the 1980s. Com. ¶¶ 30, 33–35, 38. By early 1989, MNC officials knew, or were reckless in not knowing, that their lending strategy had charted a course for disaster.[3]

Nevertheless, from January 17, 1989 through October 25, 1990 MNC officials consistently misled the investing public about the bank's financial condition. The scheme, as the plaintiffs describe it, had two separate phases. In the first phase, covering roughly the first fifteen months of the class period, the problems in MNC's real estate loan portfolio were simply whitewashed. The defendants depicted MNC as a healthy, vital institution with a record of consistently strong financial per-

---

**2.** Counsel for the plaintiffs in *Asch* most vigorously press this argument. They are the same counsel who agreed to my Rule 9(b) formulation in *Gollomp*—a decision which they chose not to challenge on appeal.

**3.** Although the complaint focuses almost exclusively on MNC's real estate loan portfolio, it makes brief mention of MNC's highly leveraged lending as well. The complaint alleges that this lending was deeply troubled by 1989. Com. ¶ 100.

formance. They fraudulently understated loan loss reserves. More generally, they made no acknowledgment of the serious underlying flaws which they either knew about or were reckless in not recognizing. Beginning in March 1990, the second phase commenced and the scheme changed. Rather than ignore the bank's problems, MNC officials embarked upon a scheme to fraudulently minimize the scope of these difficulties. The scheme was to admit small failures in a series of half-truths, so that investors would overlook the impending catastrophe. This scheme was manifested by setting inadequate loan loss reserves and by sugar-coating MNC's deteriorating situation in unduly optimistic statements.

During phase one, the defendants released the 1988 Annual Report, quarterly reports covering the last quarter of 1988 and all quarters of 1989, and advertisements in the financial press. Each of these documents contains a number of statements alleged to be false or misleading. Rather than repeat them all here, I will describe generic categories in which the statements can usefully be placed:

*Statements of earnings, income, and other indicia of financial performance.* MNC reported consistently strong income, earnings, and other indicia of financial performance. According to the plaintiffs, these reports misrepresented MNC's financial performance by, *inter alia,* fraudulently understating loan loss reserves. Com. ¶¶ 36–37, 90, 93, 96–97, 102, 105–06, 116–19, 122, 125, 128–29.

*Statements concerning the strength of MNC's real estate loan portfolio.* MNC stated that it carried a very low number of non-performing loans; that it had developed relationships with leading real estate developers in the Baltimore/Washington area with proven records of successful development; that the Baltimore/Washington real estate market and the regional economy as a whole were strong and vital; and that it had diversified its loan portfolio by financing a variety of different types of projects. All of these statements are alleged to be false.

Com. ¶¶ 91–94, 98–99, 102–05, 107, 117–18, 123–24, 126–27.

*Statements concerning MNC's internal credit review systems.* MNC represented that it maintained conservative internal credit review systems. The plaintiffs allege that these systems were not functioning. Com. ¶¶ 93–97, 102.

*Financial statements.* MNC represented that its financial statements were prepared in accordance with generally accepted accounting principles. The plaintiffs allege that, throughout the class period, the financial statements were not so prepared. Com. ¶ 195(j).

In phase two, MNC released its 1989 Annual Report, quarterly reports for the first three quarters of 1990, and other public pronouncements. I will summarize these statements chronologically:

(a) In March 1990, MNC disseminated its 1989 Annual Report. This document noted slowing real estate loan growth and an increase in nonperforming real estate loans in 1989 (though it claimed that much of these loans were located outside the Baltimore/Washington area). Com. ¶¶ 131–38, 140. It predicted "little or no growth" in real estate loans for 1990. Com. ¶ 138. Nevertheless, it predicted an earnings per share growth rate of 10% in 1990. Com. ¶ 134. It expressed "confidence" in MNC's "ability to effectively manage the risks inherent in real estate lending" and asserted that MNC was "largely insulated" from real estate crashes in New England and the Southwest. Com. ¶¶ 131, 136. It claimed "many analysts agree that the [Baltimore/Washington] economy is fundamentally sound, despite concerns about ... overbuilding." Com. ¶ 136.

The Annual Report also repeated that MNC had built strong relationships with prominent developers in the Baltimore/Washington area. Com. ¶ 139. It claimed that most commercial real estate projects funded by MNC were guaranteed and pre-leased and that the office market in the Baltimore/Washington area had vacancy rates below the national average. Com. ¶ 136. It touted MNC's credit review system. Com.

¶ 144. Finally, the Annual Report stated that MNC's loan loss reserves declined from $155.8 million in 1988 to $118.7 million in 1989. Com. ¶ 142.

(b) On April 19, 1990, MNC announced that it had earned only $6.2 million in the first quarter of 1990 (as compared to $57.4 million in the first quarter of 1989). $135 million was set aside as loan loss reserves, an $83 million increase from the fourth quarter of 1989. Com. ¶ 147. MNC attributed the increase in loan loss reserves to tightened federal standards and "a slowdown of the economic expansion within [MNC's] principal market." Com. ¶ 151.

The April 19 announcement stated that the Baltimore/Washington economy was stable compared to other areas of the country, but acknowledged that MNC was "by no means totally insulated from problem real estate loans." Com. ¶ 148. The announcement stated that MNC was in "a much slower economic environment than had been anticipated a few months ago," but expressed confidence that MNC would produce in "an above-average manner." Com. ¶ 150.

(c) At the April 24, 1990 Annual Meeting, Hoblitzell stated that the April 19 increase in loan loss reserves would be the only such extraordinary increase in 1990. He predicted "a return to a more normal earnings picture by the end of the year." Com. ¶ 153.

(d) On June 12, 1990 MNC announced it was issuing a regular quarterly cash dividend. This announcement also described a comprehensive review of MNC's operations and noted that the Baltimore/Washington real estate market was continuing to exhibit "softness." Com. ¶ 155.

(e) On July 12, 1990 MNC stated that expected to incur a loss in the second quarter of 1990, in large part as a result of increased loan loss reserves. The same day, Moody's lowered MNC's debt rating. An MNC spokesman expressed disappointment at this action and stated MNC's opinion that it "by no means represents the true underlying quality of the MNC Financial organization." Com. ¶¶ 156–57.

(f) On July 24, 1990 MNC announced second quarter losses of $74.7 million, with a $233 million addition to loan loss reserves. Com. ¶ 158.

(g) On August 14, 1990 MNC filed a Form 10–Q for the second quarter of 1990. This document repeated the quarterly results announced on July 24. Com. ¶ 160. In addition, it described "continued softening" in the regional real estate market, stated that MNC had "substantially reduced its new commitments to commercial real estate" lending, and noted that "additional provisions for possible losses above 1989 levels could continue." Com. ¶¶ 160–61.

(h) On August 16, MNC announced that it had received funding commitments from other banks which could eventually make $750 million available to meet MNC's short-term funding requirements. Com. ¶ 162.

(i) On September 27, 1990 a MNC spokesman described plans to restructure MNC's operations. Com. ¶ 166.

(j) On October 25, 1990, MNC announced third quarter 1990 losses of $173 million, with a $350 million addition to loan loss reserves. Com. ¶ 170. The announcement also revealed that MNC had agreed not to pay dividends without prior regulatory approval, to provide regulators with reports on a variety of subjects, and to maintain prescribed capital levels. Com. ¶¶ 171–72.

On October 26, 1990, MNC stock closed at $3⅞ per share, down from a high of $29⅜ during the class period. Com. ¶ 173.

### B. The Equitable Merger

On July 12, 1989, MNC and Equitable announced that they had reached a definitive merger agreement. Com. ¶ 31. On October 13, MNC filed its merger registration statement (the "Registration Statement") with the SEC, including a joint proxy statement and prospectus outlining the proposed merger. The prospectus and proxy statement were then sent to MNC and Equitable shareholders. Com. ¶ 108.

The shareholders approved the merger at a special meeting in November 1989, and the merger was effected on January 18, 1990. Com. ¶ 121.

In the Registration Statement, the Boards of Directors of MNC and Equitable endorsed the proposed merger:

> The Boards, with the advice of their respective financial advisors, concluded that the terms of the Merger are fair to the stockholders of their respective companies and that consummation of the Merger would be in the best interests of their respective companies and stockholders.

Com. ¶ 113. The Statement listed the factors that each Board had considered in deciding whether to recommend the merger. *Id.* According to the Statement, both Boards believed that the merger would allow the new company

> to realize certain economies of scale, to provide a wider and improved array of financial services to customers, and to achieve added flexibility in dealing with the region's changing competitive environment.
>
> Additionally, the Boards of Directors believe that the Merger will provide the combined company with market position and financial resources it needs to meet the competitive challenges arising from recent and expected additional changes in the bank and financial services industry.

*Id.* The plaintiffs allege that contrary to the Registration Statement, the Merger was not fair and the Board knew it or should have known it.[4] *Id.*

The Registration Statement incorporated by reference MNC's 1988 Annual Report and its quarterly reports for the first three quarters of 1989. Com. ¶ 115. The plaintiffs allege that these documents contained misrepresentations as outlined above.

### C. The Dividend Reinvestment Plan

During the class period, MNC offered its shareholders the DRIP, under which dividends would be reinvested to purchase MNC stock. Com. ¶ 215. MNC filed various registration statements and prospectuses with the SEC relating to the DRIP. These documents incorporated by reference many of the quarterly and annual reports listed above, and are alleged to be false as described above. Com. ¶ 216.

### III.

#### A. § 10(b) of the 1934 Act and Rule 10b–5

Plaintiffs' principal claims in this case are brought under § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1990).[5] Plaintiffs correctly assert that they have alleged with great specificity the various misrepresentations upon which these claims are premised. Some of these misrepresentations may not be actionable as a matter of law. For example, statements to the effect that the Baltimore/Washington regional economy is strong are not "firm-specific" and pertain to a matter as to which a potential investor could reach an independent judgment after consulting with his financial advisor. *See Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 515 (7th Cir. 1989); *Flamm v. Eberstadt*, 814 F.2d 1169, 1173 (7th Cir.1987), *cert. denied*, 484 U.S. 853, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987). However, when plaintiffs' allegations are considered as a whole, they are sufficient to meet the particularity requirements of Rule 9(b) insofar as they relate to the alleged misrepresentations themselves.

The more difficult question is whether plaintiffs have alleged with sufficient particularity facts demonstrating that defen-

---

4. They also contend that the Registration Statement presented MNC "as a very conservative bank with strict underwriting standards" and a variety of specific strengths. Com. ¶¶ 109, 114. They have not provided any quotations from the Registration Statement (other than the MNC documents incorporated by reference and summarized *supra*) to support this charge.

5. *Wolf* and *Hershey* also incorporate claims under § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), which establishes control person liability. These claims are derivative; they are contingent on the establishment of an underlying violation of the securities laws. *See, e.g., FMC Corp. v. Boesky*, 727 F.Supp. 1182, 1199 n. 19 (N.D.Ill. 1989).

dants knew or were reckless in not knowing the falsity of the alleged misrepresentations at the time that they were made. The date of July 24, 1990—when MNC announced its second quarter 1990 results—is critical in this regard. That is so because statements made after that date do not appear to be actionable.[6]

Plaintiffs pursue two separate strategies in imputing knowledge or recklessness to MNC prior to July 24, 1990. First, they focus on several major MNC borrowers in an effort to demonstrate that MNC was aware, before July 24, that these borrowers were in dire straits. Second, they highlight two geographic areas (the "East End" of the District of Columbia and "Fairfax Center" in Northern Virginia) where MNC allegedly concentrated much of its real estate lending. They seek to show that these areas were overbuilt by 1989, and that MNC should have recognized that its loans there were in trouble.

■ Plaintiffs identify six borrowers whom they allege were experiencing such severe financial difficulties during the class period (particularly after January 1990) that MNC must have known that loans which it had made to them were in serious danger of not being repaid. As to one of these borrowers, Eisinger Kilbane Associates, plaintiffs allege merely that it had defaulted on a single $39 million loan to another bank during the first half of 1990. As to another, Kettler & Scott, plaintiffs allege only that on October 6, 1990, it deeded title to two projects to American Security Bank ("ASB"), an MNC subsidiary, in lieu of foreclosure and that a *Washington Post* article published on September 26, 1990 indicated that Kettler had been negotiating since the summer with one or more of his lenders concerning other projects in the Washington, D.C. area. As to a third, Robert K. Marceca, the *Asch* plaintiffs allege that he filed for bankruptcy in August 1990 and negotiated a consensual foreclosure with MNC in May 1991. These facts are insufficient to support, as of July, 1990, the inference of knowledge or recklessness which plaintiffs suggest should be drawn.

■ Plaintiffs likewise point to events occurring at, near or after the close of the class period in support of their allegations concerning the other three borrowers whom they specially identify, Oliver T. Carr, Dominic F. Antonelli and Conrad Cafritz. However, as to these three borrowers—who collectively are alleged to have borrowed in excess of $266 million from MNC and ASB—plaintiffs further allege some facts which might have served to put MNC on notice prior to July 24, 1990 that

---

**6.** Plaintiffs in *Hershey* admit that the October 25 statement revealed the "true nature" of MNC's problems. Plaintiffs in *Asch* disclaim this admission, but their class period ends on October 25, so the October 25 release and any statements thereafter were immaterial as a matter of law. *Basic Inc. v. Levinson,* 485 U.S. 224, 230–32, 108 S.Ct. 978, 982–83, 99 L.Ed.2d 194 (1988).

None of the plaintiffs explicitly address the truth or falsity of the statements made between July 24 and October 25. Upon examination, however, those statements do not appear to be actionable. For example, the September 27 issue of the *Washington Post* contained an interview in which an MNC spokesman described plans to restructure MNC's operations. The plaintiffs have cited absolutely nothing suggesting that the statements made in the interview were false or misleading. The same is true for the August 16 announcement that MNC would receive funding from other banks.

The August 14 Form 10–Q described "continued softening of real estate markets in which [MNC] has significant loans outstanding." It went on to state that "Continued weaknesses in these real estate markets and other economic conditions could result in nonperforming assets increasing in future periods. Therefore, additional provisions for possible losses above 1989 levels could continue." These predictions turned out be accurate. The plaintiffs argue, however, that MNC should have announced that "the local real estate market was in turmoil." They further maintain that MNC should have told investors that future losses *would* (as opposed to could) continue. Com. ¶ 130. This argument is unpersuasive. "The law is clear that prospectuses need not characterize a security or risk in a pejorative manner. As has recently been stated, 'Whether or not a company used the adjective plaintiff chooses should not be the focus of the Court's inquiry.'" *In re RAC Mortgage Inv. Corp. Sec. Litig.,* 765 F.Supp. 860 (D.Md.1991) (quoting *In re Seagate Technology II Sec. Litig.,* [1989 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 94,502, at 93,201, 1989 WL 222969 (N.D.Cal. May 3, 1989); *see also Goldberg v. Meridor,* 567 F.2d 209, 218 n. 8 (2d Cir.1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978)).

substantial loan loss reserves were required. For example, on one project, Lincoln Place, Carr borrowed $27 million from ASB. He assembled the land for the project piece-by-piece during the 1980s but was never able to secure a major tenant. When the principal amount of the loan became due on June 30, 1990, ASB did not grant a one-year extension requested by Carr but allegedly allowed the loan to "ride." Further, three other Carr loans reviewed by MNC officials during the summer of 1990 (in anticipation of an examination to be conducted by banking regulators) were described by those officials as "undue and unwarranted credit risk[s]." Similarly, plaintiffs allege that MNC and other lenders were experiencing payment problems throughout 1990 in connection with outstanding Antonelli loans and that at least as early as April 1990, when articles appeared about Cafritz in the *Washington Post* and the *Washington Times*, MNC knew that he was experiencing substantial cash flow problems.

Plaintiffs' allegations concerning loans for projects in Washington's East End and in Fairfax Center are also sufficiently specific to give rise to a possible inference of knowledge or recklessness during the class period. According to plaintiffs, because of substantial overbuilding in those areas MNC must have known by October 1989 (as to the East End) and by December 1989 (as to Fairfax Center) that projects on which it had made loans could not be rented out and that repayment of the loans was therefore in jeopardy.[7]

MNC points out that throughout 1990 it was increasing its loan loss reserves to adjust for its problem loans. It may turn out that these increases were an entirely appropriate response to the crisis which was occurring and that plaintiffs' averment that MNC knowingly or recklessly established inadequate reserves is without substance. However, in accordance with the dictates of Rule 9(b), plaintiffs have particularized the basis for their averment. Moreover, they have also thereby provided a means by which reasonable parameters for the conducting of initial (and perhaps) final discovery can be set. Their allegations concerning the Carr, Antonelli, Cafritz, East End and Fairfax Center loans and MNC's purportedly inadequate response to the deterioration of these loans in the setting of loan loss reserves can be put to the test. If they are found to be meritorious after MNC documents have been produced and a reasonable number of MNC representatives have been deposed, further discovery can be authorized. If, on the other hand, preliminary discovery does not bear out plaintiffs' particularized allegations, the litigation can promptly be brought to an end. In short, plaintiffs may now dip in the narrow bay which they have charted but not use their limited allegations as a license to fish in the vast ocean beyond.

### B. §§ 11, 12 and 15 of the 1933 Act and § 14(a) of the 1934 Act

■ The focus of this litigation is plaintiffs' claims under § 10(b) of the 1934 Act and Rule 10b–5. In addition to these claims, however, *Wolf* and *Asch* incorporate claims under §§ 11, 12 and 15 of the 1933 Act and § 14(a) of the 1934 Act.[8]

---

7. To the extent that plaintiffs allege that MNC made loans in these areas with knowledge that the borrowers would likely default, they allege that MNC acted irrationally. The burden of proving these allegations, of course, may be somewhat heavy. *Cf. DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990) ("People sometimes act irrationally, but indulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud").

8. *Wolf* and *Asch* allege that the defendants violated §§ 11 and 12(2) both in the text of the DRIP and MNC/Equitable merger registration statements and in various annual and quarterly reports which were incorporated by reference into the registration statements. The analysis set forth *infra* in the text covers the latter category of statements.

Respecting the former, the plaintiffs focus on statements of reasons, beliefs, and opinions. For example, the merger registration statement contains the following allegedly untruthful statement: "Each Board believes the Merger is fair and in the best interests of the stockholders of its respective company." Under the recent Supreme Court decision in *Virginia Bankshares, Inc. v. Sandberg*, —— U.S. ——, 111 S.Ct. 2749,

Plaintiffs argue that Rule 9(b) does not apply to these claims. I disagree.

Rule 9(b) applies to "averments of fraud or mistake." In assessing Rule 9(b)'s application to the §§ 11 and 12(2) claims at issue here, the question therefore is whether those claims constitute "averments of fraud." [9] The plaintiffs, of course, argue that they do not. They seize upon legal distinctions between the elements of §§ 11 and 12(2), on one hand, and common-law fraud, on the other.

A basic element of common-law fraud is scienter, or an intent to defraud. *See, e.g., Macon–Bibb County Hosp. Auth. v. Georgia Kaolin Co.*, 646 F.Supp. 90, 92 (M.D.Ga.1986), *aff'd*, 817 F.2d 98 (11th Cir. 1987); *Kronfeld v. First Jersey Nat'l Bank*, 638 F.Supp. 1454, 1467 (D.N.J.1986). Sections 11 and 12(2) do not contain a scienter element. Liability under § 11 is imposed either under a strict liability standard or a negligence standard; liability under § 12(2) is imposed under a negligence standard.[10] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208, 96 S.Ct. 1375, 1388, 47 L.Ed.2d 668 (1976) (§ 11); *Loan v. FDIC*, 717 F.Supp. 964, 968 n. 9 (D.Mass.1989) (§ 12(2)). Plaintiffs contend that because of this distinction, §§ 11 and 12(2) claims can never sound in fraud and that therefore Rule 9(b) has no application to §§ 11 and 12(2) claims.

Plaintiffs' argument has an analytical tidiness about it, but it does not withstand scrutiny. The mere fact that plaintiffs need not prove scienter to recover under §§ 11 and 12(2) does not mean that §§ 11 and 12(2) claims can never "sound in fraud." On the contrary, a plaintiff may allege, under §§ 11 and 12(2), a scheme which, if proven, would constitute fraud. That is precisely what plaintiffs have done here. The gist of their claims is that MNC embarked upon a scheme fraudulently to overstate its financial health in quarterly

2757, 115 L.Ed.2d 929 (1991), such statements are actionable only if they "were made with knowledge that the directors did not hold the beliefs or opinions expressed." This requirement in itself would appear to be an independent reason to apply Rule 9(b), for it requires proof of knowledge, which is equivalent to scienter. *Cf. id.* at n. 5 (reserving the question whether scienter is an element of recovery under § 14(a)).

9. Although the discussion which follows in the text is limited to §§ 11 and 12(2) of the 1933 Act, it applies equally to § 14(a) of the 1934 Act. Rule 9(b) applies to § 14(a) claims when the underlying claim sounds in fraud. *See Daly v. Neworld Bank for Savings*, [1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,247, at 96,089, 1990 WL 8095 (D.Mass. Jan. 25, 1990) ("Rule 9(b) applies to Section 14(a) claims where 'fraud lies at the core of the action'") (quoting *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir.1985)); *Goldman v. Lexington Ave. & 42nd St. Corp.*, [1987 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,189, at 95,878, 1987 WL 8340 (S.D.N.Y. Mar. 12, 1987). This is so despite the fact that § 14(a) establishes a negligence standard. *Wilson v. Great American Indus., Inc.*, 855 F.2d 987, 995 (2d Cir.1988) (§ 14(a) establishes a negligence standard); *cf. Virginia Bankshares, Inc. v. Sandberg*, 111 S.Ct. 2749, 2757 n. 5 (reserving the question whether § 14(a) contains a scienter element).

As for the § 15 claim, it asserts "control person" liability and comes into play only if the plaintiffs succeed in establishing an underlying securities law violation. *Jenkins v. Fidelity Bank*, 365 F.Supp. 1391, 1402 (E.D.Pa.1973).

10. These are the general rules regarding §§ 11 and 12(2) liability. However, a stricter standard may apply here to the extent that plaintiffs challenge the accuracy of forward-looking statements. Under SEC Rule 175, 17 C.F.R. § 230.-175 (1991), forward-looking statements (or, in the vernacular of securities law, "soft" information) are not actionable unless they are made without a reasonable basis or in bad faith. *See Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509 (7th Cir.1989).

Indeed, it might be contended that scienter is required in a case such as this. Rule 175 applies to "soft" forward-looking statements which an issuer chooses, but is not required, to make to the investing public. *See Walker v. Action Indus.*, 802 F.2d 703, 707 (4th Cir.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1000 (1987). Here, MNC was mandated to include loan loss reserves as part of the financial data which it provided. Thus, an additional breakwater to Rule 175's "safe harbor" may be appropriate. This is particularly true since calculating loan loss reserves was an ordinary part of MNC's business, not a prediction made for the specific transaction as to which the registration statement was being filed. Many items appearing on an earnings statement or balance sheet are based upon the exercise of judgment, including implicit prediction of future results of past activities. It certainly seems open to question whether in enacting §§ 11 and 12 Congress intended to create potential federal claims merely for faulty prognostication whenever a corporation which merges with another or seeks capital on the open market.

and annual reports. While they have invoked §§ 11 and 12(2) as well as § 10(b) as legal bases for these claims, the gravamen of their case is fraud.[11]

In like circumstances, other courts have held that Rule 9(b) applies to claims brought under §§ 11 and 12(2). *See, e.g., Haft v. Eastland Fin. Corp.*, 755 F.Supp. 1123, 1131–33 (D.R.I.1991) (§ 11); *In re Elscint, Ltd. Sec. Litig.*, 674 F.Supp. 374, 384 (D.Mass.1987) (§ 11); *Friedman v. Arizona World Nurseries Ltd. Partnership*, 730 F.Supp. 521, 542 (S.D.N.Y.1990) (§ 12(2)), *aff'd*, 927 F.2d 594 (2d Cir.1991); *Kilmartin v. H.C. Wainwright & Co.*, 637 F.Supp. 938, 941 (D.Mass.1986) (§ 12(2)). *But cf. In re Lilco Sec. Litig.*, 625 F.Supp. 1500, 1503 (E.D.N.Y.1986) (Rule 9(b) does not apply to § 11; no fraud allegation present); *Ross v. Warner*, 480 F.Supp. 268, 273 (S.D.N.Y.1979) (same); *Loan v. FDIC*, 717 F.Supp. 964, 968 n. 9 (D.Mass.1989) (same; § 12(2)); *Seidel v. Public Serv. Co.*, 616 F.Supp. 1342, 1356–57 (D.N.H.1985) (same). The approach taken by these cases is logical, sensible and effects sound policy. Rule 9(b) applies to "all averments of fraud." Its application should depend on the substance of a plaintiff's allegations, not upon the guise in which he portrays them.

In summary, defendants' motions to dismiss plaintiffs' federal securities law claims will be denied and discovery will proceed on those issues identified above as to which plaintiffs have made sufficiently

particularized allegations under Rule 9(b). I will defer ruling upon defendants' motion to dismiss the state-law negligent misrepresentation claim which the *Hershey* plaintiffs have asserted until after initial discovery on the identified issues has been conducted.[12] If I then determine that plaintiffs have no cognizable federal claims, I will decline to exercise supplemental jurisdiction over the state law claim. *See* 28 U.S.C. § 1367(c).

---

**11.** This point is reinforced by the intimate nexus between the §§ 11 and 12(2) claims in *Asch* and *Wolf*, on one hand, and the § 10(b) claims in *Asch* and *Hershey*, on the other. All of these claims are part of an organic whole. *Cf. Herman & MacLean v. Huddleston*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (securities laws are cumulative; one statement or omission can be actionable under both §§ 10(b) and 11). *Asch*, of course, contains both §§ 11 and 12(2) and § 10(b) claims in the same complaint. Although *Wolf* incorporates only §§ 11 and 12(2) claims, *Wolf*'s claim was originally a part of the *Gollomp* complaint, which is the progenitor of *Asch*. After *Gollomp* was dismissed, *see* 756 F.Supp. 228 (D.Md.1991), Wolf severed his claim and attempted to sanitize it by removing the word "fraud." It is clear, however, that *Wolf* is part of the corpus of § 10(b) litigation here. Indeed, large sections of the *Wolf, Asch,*

and *Hershey* complaints are verbatim copies of one another.

**12.** I will set a deadline of 75 days for this phase of discovery. Litigation of this kind, which perforce distracts executive attention and is disruptive of sound strategic planning, should not be permitted to hang like the sword of Damocles over the bank. Further, if MNC has misjudged (either too optimistically or too gloomily) the value of plaintiffs' claim in these actions, this might itself affect the value of MNC's stock and give rise to future class actions (just as new purported classes sprung up during the first three quarters of 1990 as MNC issued its earnings statements.) Under these circumstances, having made allegations of fraud, plaintiffs must devote sufficient resources to the case to have it resolved on an expedited basis.