## In re CRYOMEDICAL SCIENCES, INC. SECURITIES LITIGATION *.

### This Document Relates to All Actions.

### Civ. A. No. AW 94–873.

United States District Court,
D. Maryland,
Southern Division.

April 26, 1995.

---

* Plaintiffs have purportedly alleged a class action suit and seek to have the Court certify that class. However, the Court does not, by using this cap-tion, decide or infer that certification is appropriate.

John B. Isbister, Tydings and Rosenberg, Baltimore, MD, Steven J. Toll, Cohen, Milstein, Housfeld and Toll, Washington, DC, William C. Sammons, Tydings & Rosenberg, Baltimore, MD, Sherrie R. Savett, Berger & Montague, Philadelphia, PA, Arthur Stock, Berger & Montague, Philadelphia, PA, for plaintiff Adeline Sirota, on behalf of themselves and others similarly situated.

Steven J. Toll, Cohen, Milstein, Housfeld and Toll, Washington, DC, William C. Sammons, Tydings & Rosenberg, Baltimore, MD, Sherrie R. Savett, Berger & Montague, Philadelphia, PA, for consolidated plaintiffs Richard Bieber, Marilyn Feingold, Jeffrey Schanback, on behalf of themselves and others similarly situated.

David Clarke, Jr., Piper & Marbury, Washington, DC, for defendants Cryomedical Sciences, Inc., J.J. Finkelstein, Sam Carl Martin Weissman, Howard S. Breslow.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

This securities class action is brought on behalf of all persons who purchased common stock of Cryomedical Sciences, Inc. (hereinafter referred to as "Cryomedical" or "the Company") during the period from September 13, 1991 through April 4, 1994 (hereinafter referred to as "class period"). Particularly, Bea Boxer, Walter Boxer and Adeline Sirota and others bring this action on behalf of other shareholders. The Defendants are Cryomedical, a Delaware corporation with its principal office located in Rockville, Maryland, J.J. Finkelstein ("Finkelstein"), Sam Carl ("Carl") and Howard S. Breslow ("Breslow") (hereinafter also referred to collectively as "Defendants"). The Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and of Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5, and common law.

Pending before the Court is Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint. The Court conducted a hearing in open court on the record on February 27, 1994. Having considered the parties' respective memorandum and any exhibits attached thereto, and having had the benefit of oral argument, the Court will now address the merits of that motion.

### FACTS

#### The Parties

Plaintiff Bea Boxer purchased 1,000 shares of Cryomedical stock on August 17, 1992, at a

price of $8.75 per share. She subsequently sold these shares at a substantial loss. Plaintiff Walter Boxer, purchased 500 shares of Cryomedical common stock on September 9, 1992, at a price of $8.00 per share. Plaintiff Adeline Sirota, purchased 500 shares of Cryomedical common stock on August 17, 1992, at a price of $8.80 per share.

Plaintiff Richard Beiber purchased 1,000 shares of Cryomedical stock on December 26, 1991, at a price of $13.50 per share, and he purchased 1,000 warrants with an exercise price of $2.00 per share, for $12.25 per warrant on January 14, 1992, which warrants he subsequently exercised. Plaintiff Paul Darlington purchased 1,000 shares of Cryomedical common stock on January 27, 1994, at a price of $3.75 per share. Plaintiff Marilyn Feingold purchased 100 shares of Cryomedical common stock on January 8, 1992, at a price of $8.00 per share, and made additional purchases of Cryomedical common stock during the Class Period. Plaintiff Richard G. Newman purchased 700 shares of Cryomedical common stock on December 26, 1991, at a price of $13.25 per share, and purchased an additional 350 shares on June 23, 1993, at a price of $4.75 per share. Plaintiff Jeffrey Schanback purchased 400 shares of Cryomedical common stock on October 13, 1992, at a price of $8.25 per share.

Cryomedical, formed in 1987, is engaged in the research, development, manufacture and marketing of products for use in hypothermic (low-temperature) medicine. Its common stock is traded on the National Association of Securities Dealers Automated Quotation ("NASDAQ") system. At all relevant times, Finkelstein was Cryomedical's President, Chief Executive Officer and a member of its Board of Directors; Carl was a director; and Breslow was a director and partner at the

law firm which served as Cryomedical's general counsel.

Since 1987, Cryomedical has been developing two primary products, a cryoprobe called the "CMS AccuProbe" (the "Accuprobe") and a series of hypothermic synthetic blood solutions (the "Solutions").[1] The AccuProbe is a sophisticated surgical device intended to be used to perform minimally invasive cryosurgery for prostate, liver and other kinds of surgery. The AccuProbe is designed to freeze and destroy cancerous tumors. It uses super-cooled liquid nitrogen which circulates through disposable probes to freeze and destroy unhealthy tissue.

The surgeon inserts the probe and uses ultrasound imaging to guide it to the unhealthy tissue. The advantage of cryosurgery is that it is much less invasive than traditional surgery and does not require removal of large volumes of healthy tissue surrounding the tumors. Thus by using the AccuProbe, a surgeon can avoid making major incisions to perform the surgery.

Surgeons have found the AccuProbe particularly useful in performing prostate cancer surgery. However, in using the device for prostate cancer surgery, they also used a catheter designed to circulate warm fluid in order to protect the urethra. Cryomedical subsequently designed a Urethral Warmer as an accessory to the AccuProbe. Each of these products were subject to FDA regulations.

### FDA Procedures/Regulations

The Food, Drug, and Cosmetic Act requires persons who own or operate any establishment engaged in the "manufacture, preparation, propagation, compounding, or processing" of a device to register with the Food and Drug Administration ("FDA"). 21 U.S.C. § 360(b); 21 C.F.R. § 807.20(a).[2]

---

1. Cryomedical's public disclosures with regard to the Solutions are not at issue in this litigation.

2. A device is

an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part or accessory, ... which is— ... (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or (3) intended to

affect the structure or any function of the body of man or other animals, and which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes.

21 U.S.C. § 321(h). The parties do not dispute that the AccuProbe and the Urethral Warmer are "devices."

Such persons are required to file a list of devices which are being "manufactured, prepared, propagated, compounded, or processed ... for commercial distribution." 21 U.S.C. § 360(j)(1); 21 C.F.R. § 807.20(a). Thus, Cryomedical could not commercially market its AccuProbe or Urethral Warmer in the United States without FDA approval.

There are two different methods for obtaining approval: a § 510(k) premarket approval and a formal premarket application. The § 510(k) premarket approval is much simpler and is available for devices which are substantially equivalent to previously approved devices. Under the more formal method, at least ninety days prior to distributing a device commercially, a person who is subject to the Act's registration requirements must submit to the FDA a § 510(k) premarket notification. 21 U.S.C. § 360(k); 21 C.F.R. § 807.81(a).[3] This notification is intended to provide the FDA with sufficient information concerning the device for the FDA to determine what level of regulatory approval or clearance is necessary before the device can be distributed commercially. After reviewing a § 510(k) premarket notification, the FDA will (1) issue an order declaring that the device is "substantially equivalent" to another device that is already being legally marketed; (2) request additional information; or (3) advise the person who filed the notification that the device must be subjected to the more rigorous premarket approval process.[4] 21 C.F.R. §§ 807.100(a), 814.1(c); 21 U.S.C. §§ 360e(a), 360c(f).

Under the regulations, if the FDA determines after review of the 510(k) premarket notification that the new device is substantially equivalent to another device which was commercially marketed in the United States prior to May 28, 1976, or to a device that began to be commercially marketed after May 28, 1976 but which has been classified as a Class I or Call II device,[5] the new device

may be commercially marketed without any further action by the FDA. 21 C.F.R. §§ 807.100(a), 814.1(c); 21 U.S.C. §§ 360e(a), 360c(f). The FDA cleared the AccuProbe for commercial marketing in 1991, after Cryomedical submitted a § 510(k) premarket notification, because the AccuProbe was substantially equivalent to other products commercially marketed in the United States prior to May 28, 1976.

Even before a device has been cleared or approved for commercial marketing, it can be distributed for testing if an investigational device exemption ("IDE") is available for the device. 21 C.F.R. §§ 812.1, 814.1(c); 21 U.S.C. §§ 360e(a), 360j(g). In some instances, the institutional review board ("IRB") at a medical institution where the testing is being conducted will determine that the device involves "significant risk." In that event, there is no IDE available for the device unless and until the FDA has approved a detailed testing protocol which involves, among other things, specifying only a limited number of medical institutions at which the testing can be conducted. 21 C.F.R. § 812.20.

In the absence of a determination that the device involves significant risk, however, testing can be performed at any medical institution pursuant to an "abbreviated" IDE. An abbreviated IDE requires only that the sponsor of the investigation (e.g., the doctor who is going to perform surgeries using the device) obtain approval by his or her IRB after presenting an explanation of why the device is not a significant risk device and making a commitment that he or she will obtain informed consent from the subjects of the investigation and comply with certain monitoring and record keeping requirements. 21 C.F.R. § 812.2(b).

The FDA's regulations specifically state that, if an abbreviated IDE is available for a device, the device can be shipped to physi-

---

3. The provision that is codified as 21 U.S.C. § 360 is Section 510 of the Act as originally adopted in 1938. This section was amended to regulate devices for the first time in 1976.

4. The premarket approval process requires detailed clinical testing of the device. 21 U.S.C. §§ 360e(c), (d).

5. The FDA assigns each device to one of three classes based on the level of controls necessary to provide reasonable assurance of the device's safety and effectiveness. 21 U.S.C. § 360c.

cians prior to a clearance or approval by the FDA. 21 C.F.R. § 812.1(a). It was not until February 4, 1994, that the FDA first determined that Cryomedical's Urethral Warmer involved significant risk and, therefore, could only be tested pursuant to a full scale IDE which would only be available after FDA approval of a testing protocol. Under this process, Cryomedical could distribute its Urethral Warmer to surgeons using the Accu-Probe as long as they obtained approval from the review boards at their hospitals and followed the other procedural requirements set forth in the regulations for an abbreviated IDE.

### The Statements

In 1991 and each subsequent year thereafter, Cryomedical filed with the Securities Exchange Commission ("SEC") Annual Reports on Form 10–K ("10–K") and yearly Annual Reports.[6] The Company also issued various press releases together with its 10–Ks and Annual Reports which now form the basis of this lawsuit.

On September 13, 1991, Cryomedical filed its 1991 10–K with the SEC. In it, Cryomedical introduced its readers and potential investors to the medical field of cryosurgery. By way of introduction to its Accu-Probe, the Company described in detail prior problems the medical community had experienced with cryosurgery. It also described that it was a developmental stage company and that its AccuProbe was a product-in-development. Cryomedical, in some detail, emphasized the government regulations involved in product development. It announced that the FDA had accepted its 510(k) premarket notification for the Accu-Probe in April 1991, clearing the way for commercial marketing of the device without requiring the more rigorous premarket approval process.

In the 1991 Annual Report, which Cryomedical subsequently filed with the SEC on January 6, 1992, Finkelstein wrote,

> "[t]he Company delivered the final prototype of the device to Allegheny General Hospital in late October. Since that time, surgeons at Allegheny General have been utilizing the CMS AccuProbe on patients with prostate and liver cancer on a daily basis."

On September 2, 1991, Cryomedical's stock closed at 3⅜₁₆. On December 31, 1991, the stock closed at 13. Throughout this period, the stock price generally increased. The stock reached its highest trading level on November 05, 1991, closing at 19½.[7]

In March, 1992, Cryomedical announced that it had received ten orders for its Accu-Probe. On June 30, 1992, Cryomedical issued a press release announcing the first commercial shipment of the AccuProbe to Allegheny General Hospital in Pittsburgh, Pennsylvania. The Company informed readers of its plan to ship, on July 10, its second device to The University of Texas M.D. Anderson Cancer Center in Houston, Texas, and to continue regular monthly shipments throughout fiscal 1993. The Company warned of the difficulty in predicting the scope of market acceptance, but stated that its goal was to deliver between 25 and 35 systems over the next 12 months. Finkelstein went on to describe the Defendants' excitement about officially entering the commercial market. At the time of the release, over 100 patients had been treated using the AccuProbe. Seventy-five of those patients

---

**6.** Cryomedical operates on a fiscal year that ends June 30.

**7.** The following table summarizes the upward surge in the price:

| Date | Closing Price |
| --- | --- |
| September 13, 1991 | 3¾ |
| September 18 | 4⅝ |
| September 19 | 5⅛ |
| September 20 | 6⅞ |
| September 23 | 7⅛ |
| September 27 | 6 |
| October 1 | 6⅛ |
| October 18 | 7¼ |
| October 21 | 8¼ |
| October 28 | 10⅞ |
| October 31 | 12 |
| November 1 | 14¼ |
| November 5 | 19½. |

By January 31, 1992, the closing price had declined to 15.

were treated for prostate cancer.[8]

On August 14, 1992, Cryomedical issued another press release, announcing that the University of Texas M.D. Anderson Cancer Center in Houston had successfully used the AccuProbe to treat prostate cancer patients and expected to treat 50 more prostate cancer patients by the end of 1992. Cryomedical also announced that more than 80 prostate cancer patients around the country had been treated using the AccuProbe.[9]

On or about September 28, 1992, Cryomedical filed its 1992 10–K. In that report, Cryomedical included a discussion on the field of cryosurgery and announced that the Company had shipped the first AccuProbe in June, 1992. Cryomedical also stated that it had designed a full complement of disposable accessories for the AccuProbe which were being marketed along with the device.

The Company further advised that the FDA had accepted its premarket notification for the AccuProbe in April 1991. Immediately thereafter, it referred its readers to the "Governmental Regulation" section where it described the regulatory process for the AccuProbe, the Solutions, and related instrumentation. Cryomedical also explained, in its "Market for Registrant's Common Equity and Related Stockholder Matters: Results of Operations" section that it had sustained in excess of four million dollars in losses for the 1992 fiscal year.[10]

In October, 1992, Cryomedical filed a premarket notification for its Urethral Warmer. At the time, it did not disclose the filing to the public. On November 22, 1992, The New York Times published an article entitled "If Fire Fails Against Cancer, Try Ice" by Lawrence M. Fisher. Fisher described cryosurgery and the AccuProbe. He emphasized that cryosurgery "is now limited to men who have already had one of the other treatments." He went on to explain

[b]ecause the prostate is so close to other sensitive organs, like the rectum and the bladder, the surgeon must take care not to freeze any more tissue than necessary. A warmed catheter preserves the urethra, which is surrounded by the prostate.

Cryomedical later included the article in an investor package.

While Cryomedical was gaining position in the cryosurgery market, in late 1992, two urologists [11] complained to the FDA that Cryomedical was promoting its AccuProbe for the treatment of prostate cancer. Cryomedical discussed the correspondence with an FDA official who informed Cryomedical that "you [Cryomedical] should turn down the thermostat on this—'chill'; we have no regulatory concerns with Cryomedical Sciences." The FDA official assured Cryomedical that the use of the term "prostate" in Cryomedical's promotional materials was acceptable, including the term "prostate cryosurgery." However, the FDA official directed Cryomedical to discontinue using the word "treatment" in its promotional brochures.

At a follow-up meeting requested by Cryomedical, Cryomedical pressed the FDA as to whether promotion of the AccuProbe as a tool for prostate cancer cryosurgery would be a violation of any regulations; the FDA did not note any problems. Thereafter, Cryomedical promoted its AccuProbe in accordance with the instructions it had received from the FDA. At this time, Cryomedical did not report any of these involvements with the FDA to its shareholders.

On or about February 22, 1993, Cryomedical disseminated its 1992 Annual Report to its shareholders. In a letter to the shareholders, Finkelstein informed readers about Cryomedical's first commercial shipment of the AccuProbe. He described the types of

---

**8.** On March 2, 1992, Cryomedical's stock had a closing price of 12¾. On March 31 the closing price was 9⅝.

**9.** *On the day of the announcement, the stock* price increased 1⅛ to close at 8. From there, the price generally declined and closed at 7 on August 31, 1992.

**10.** On September 25, 1992, the closing price for Cryomedical's stock was 9; on September 28, it was 8¾; and, on September 30, 1992, it closed at 9½.

**11.** Plaintiffs do not dispute that these two urologists had an economic interest in the success, or failure, of the AccuProbe.

surgeries in which surgeons had successfully used the AccuProbe. He also emphasized that the Company had been able to manufacture and commercially ship its first Accu-Probe "all within 30 months of the Company's initial public offering in 1989."

The 1992 Annual Report also included various articles about the success of the Accu-Probe and the area of cryosurgery. Under the heading "CMS Milestones", Cryomedical remarked that "[t]he Company introduced the CMS AccuProbe system ... at the annual American Urological Association convention.... This event marked the first time a functional, commercial system was displayed." [12] However, the 1992 Annual Report did not include any statements concerning the use of a urethral warming device.

On June 29, 1993, Cryomedical issued a press release wherein it stated that it had received an order for 36 AccuProbes from U.S. Medical, a medical device distributor. With regard to the order Finkelstein added "[w]e are extremely excited.... Clearly, this indicates the rapidly growing market for the AccuProbe system.... This is a great way to start off fiscal '94."

On or about September 28, 1993, Cryomedical filed with the SEC its 1993 Annual Report on Forms 10–K for the fiscal year ending June 30, 1993. In it, Cryomedical announced that it "submitted a 510(k) premarket notification to the FDA in October 1992 for its urethral warmer system, a device used to protect the patient's urethral tissue from the freezing temperatures associated with the cryosurgery of the prostate gland." Cryomedical also explained that in January 1993, the FDA had requested that the Company supply additional clinical data concerning the safety and efficacy of the device. In August 1993, the Company amended its 510(k) premarket notification to comply with the FDA's request.

On December 22, 1993, Cryomedical disseminated its 1993 Annual Report to shareholders. In a letter to the shareholders, under the heading "Out of the Laboratory, Into the Marketplace," Finkelstein wrote:

In 1991, the CMS AccuProbe was granted marketing clearance from the FDA for use on oncology, urology, liver surgery, gynecology and general surgery, among others, permitting surgeons to use the device in these areas. Our system has been in general use, as differentiated from experimental use, since October 1991. Commercial marketing began in 1992.

Cryomedical, under the heading "CMS Accu-Probe: The Cutting Edge of Cryosurgery," wrote

The combination of the CMS AccuProbe and ultrasound technology has created a surgical breakthrough of significant proportions. Prostate cancer cryosurgery, for example, has been used in hundreds of procedures. Guided by transrectal ultrasound images, the surgeon is able to insert the probes percutaneously (through the skin) and precisely target and freeze the cancerous gland. The entire procedure is accomplished without any major incisions. Destroyed tissue is then harmlessly absorbed by the body over time. The result is reduced patient trauma, lower risk of complications, and faster patient recovery.

On January 17, 1994, Cryomedical issued a press release announcing that the FDA had informed it that the agency would not grant 510(k) premarket clearance for the Urethral Warmer, but instead would require premarket approval prior to commercial marketing of the device. Cryomedical emphasized its disagreement with FDA's decision, stating that the "FDA's position represents an inappropriate escalation of the regulatory standards." According to Finkelstein, "[t]his moving target makes it extremely difficult for a company to successfully plan regulatory submissions to the Agency and conduct its business with any degree of confidence."

With regard to the effect that Cryomedical's failure to receive premarket clearance for the Urethral Warmer would have on the success of the AccuProbe Finkelstein stated,

[w]ithout a urethral warmer, men undergoing prostate cryosurgery may experience urethral sloughing (shedding of destroyed

12. On the day of its filing, the closing price for Cryomedical's stock was up slightly from the day before. Overall, this information appears to have had no impact on the price.

tissue) which could increase patient discomfort during recovery. However, it is possible that physicians will use alternative means to avoid such complications. The Company anticipates that FDA's action will make it more difficult to market the CMS AccuProbe for urological cryosurgery. However, at this time the Company does not have sufficient information to determine to what extent it will adversely effect such sales.

On February 4, 1994, Cryomedical issued another press release. It announced that it had met with FDA on February 2 "to discuss the recent letter sent by FDA to CMS requiring the CMS urethral warming device to receive Premarket Application (PMA) approval ..." Cryomedical summarized the outcome of its meeting with the FDA.

... FDA stated at the meeting that it would reconsider 510(k) clearance for the warmer if the Company meets the following conditions:

1) submits a new 510(k) designating the warmer as an 'accessory' to the already cleared AccuProbe or other cryosurgical devices for use in general urological procedures (as opposed to specific procedures). FDA indicated that the submission would be expeditiously reviewed;

2) submits, in the 510(k), clinical data from sites which have investigated the warmer showing that the warmer protects the urethra from damage during a variety of urological cryosurgery procedures;

3) informs all existing CMS warmer investigational sites that because FDA regards the warmer to be an accessory to a marketed surgical device, the agency considers the study a 'significant risk device study' and therefore requires FDA preclearance of the investigational protocol and plan. Such designation does not, however, suggest or imply that the CMS warmer is in any way unsafe; and

4) submits an Investigational Device Exemption (IDE) application to FDA for review of the IDE. CMS plans to promptly submit the IDE.

According to J.J. Finkelstein ... 'I believe we had a very productive meeting with FDA and addressed a number of issues that previously had not been clear. In that regard, FDA acknowledged that since the filing of the first 510(k) over fifteen months ago, several policy changes within the Agency have had a bearing on this and a number of other 510(k) applications.'

Mr. Finkelstein further stated, '.... During this period and until we receive regulatory clearance, we will market the CMS AccuProbe without providing any additional urethral warming systems as investigational devices. Although AccuProbe sales in the urological field are anticipated to slow down to some degree until the warmer is cleared for marketing, at this time the Company does not have sufficient information to determine to what extent. Other fields of use for the AccuProbe such as general cryosurgery, neurocryosurgery and gynecological cryosurgery will not be affected.'

On April 4, 1994, Cryomedical issued another press release stating that on March 31, 1994, it had received a warning letter from FDA concerning its promotional materials for the AccuProbe.

The letter stated that FDA 'has determined that these materials contain statements, suggestions, and implications which are misleading because they promote the product beyond its intended use.' While confirming that CMS obtained 510(k) marketing clearance from FDA for use of the CMS AccuProbe 'as a cryosurgical tool in the fields of dermatology, general surgery, neurosurgery, thoracic surgery, ENT, gynecology, oncology, proctology and urology', the letter takes issue with the promotion of the CMS AccuProbe system specifically for the 'treatment of prostate cancer,' and generally for the 'treatment of any specific disease state.'

The Company may continue to market the CMS AccuProbe in the fields indicated by its 510(k) and physicians may continue to utilize the CMS AccuProbe for cryosurgery (the destruction of unwanted tissue by freezing) as they deem appropriate for

their patients in their practice of medicine. Accordingly, CMS does not anticipate that the letter from FDA will have a material impact on future sales.

\* \* \* \* \* \*

According to the company, approximately eighteen months ago two urologists, who are believed to have competing economic interests, wrote to FDA complaining of the use of cryosurgery for treatment of prostate cancer.... During a subsequent telephone conversation between CMS and FDA, an FDA official stated, 'You [CMS] should turn down the thermostat on this ___ 'chill'; we have no regulatory concerns with Cryomedical Sciences.' It was indicated, however, that the term 'treatment' should not be used in promotional activities, which CMS has since strictly followed. The FDA official stated that the Agency had no concern with the term 'prostate' used in the company's proposed advertising. This included the term 'prostate cryosurgery'. With regard to 510(k) clearance for the use of the AccuProbe as a cryosurgical tool in the field of oncology, the FDA official also agreed that the term 'cancer' is synonymous with 'oncology', a cleared area of use. CMS confirmed these conversations with a letter to the Agency from CMS' FDA counsel.

\* \* \* \* \* \*

It should be noted that earlier cryosurgical devices, upon which the AccuProbe 510(k) was based, were similarly marketed for use in these areas and related promotional brochures referred to prostate probes, tumor probes and other specific terminology indicating or implying specific uses. Moreover, since 1966 there have been hundreds of published medical papers reporting on the results of cryosurgery utilized in the fields of urology and oncology to freeze and destroy malignant and benign prostatic tissue, bladder tissue and others. Many of these papers were cited in the AccuProbe 510(k).

On April 6, Bea Boxer, Walter Boxer and Adeline Sirota filed a class action complaint against Cryomedical alleging that they were guilty of securities fraud violations. On April 11, 1994, represented by the same counsel as the April 6 plaintiffs, Richard Bieber, Paul Darlington, Marilyn Feingold, Richard Newman and Jeffrey Schanback filed a virtually identical class action complaint against Cryomedical. By Order dated July 29, 1994, the Court consolidated the two putative class actions. On August 29, 1994, Plaintiffs filed a Consolidated Amended Class Action Complaint.

In the Complaint, Plaintiffs allege that after Cryomedical's January 17, 1994 disclosure regarding the status of a 510(k) for the Urethral Warmer that the Company's stock, which had traded as high as $19 per share during the class period, dropped to $3–⅜ by January 19, 1994. They allege that the Defendants' public statements made prior to this time were materially misleading because they failed to disclose the following facts:

(a) that the use of the AccuProbe for prostate cancer surgery required the use of a Urethral Warmer or similar device during surgery, to prevent side effects;

(b) that the Urethral Warmer had not been approved for commercial sale by the FDA, nor had any similar device, and that in January 1993 the Company had been informed that its initial application for marketing the Urethral Warmer would not be approved;

(c) that there was a substantial risk that, if the Urethral Warmer were denied approval, the AccuProbe would suffer decreased sales;

(d) that successful marketing of the AccuProbe for prostate cancer surgery would be affected by whether the Company gained FDA approval of the Urethral Warmer; and,

(e) that Cryomedical was violating FDA regulations and misleading doctors by promoting the AccuProbe for treatment of prostate cancer, a use not approved by the FDA.

Accordingly, in Count I of the Complaint, Plaintiffs allege that Defendants violated § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder.[13] In Count II,

---

13. Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instru-

Plaintiffs allege violations of § 20(a) of the Exchange Act against "controlling person Defendants" [14], namely Defendants Finkelstein, Carl and Breslow. Plaintiffs also allege negligent misrepresentation, in Count III, against all Defendants.

The core of Plaintiffs' allegations is twofold. First, Plaintiffs argue that "Defendants manipulated the price of [Cryomedical's] common stock by hiding from the investing public the fact that Cryomedical's only commercial product could not be widely marketed for its anticipated purpose without an additional product, for which it had not received regulatory approval." Second, Plaintiffs argue that "Cryomedical hid from investors the fact that its promotional literature violated federal regulations, and that it could not legally promote its product for use as a treatment for any particular disease." (Paper No. 22, at 1). According to Plaintiffs, Defendants withheld this information from investors throughout the class period. The Defendants have moved to dismiss pursuant to Rule 12(b)(6).

## DISCUSSION

### A. *Legal Standards*

The Court should not dismiss a plaintiff's complaint, pursuant to Rule 12(b)(6), unless it appears beyond doubt that he can prove no set of facts that would entitle him to relief.

*Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Faulkner Advertising Assoc. v. Nissan Motor Corp.,* 905 F.2d 769, 771–71 (4th Cir.1990). In ruling on a Rule 12(b)(6) motion, the Court must accept the complaint's allegations as true, and must liberally construe the complaint as a whole. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969); *Finlator v. Powers,* 902 F.2d 1158 (4th Cir.1990). However, the Court's obligation does not stop with the Plaintiffs. The Court will not permit Plaintiffs, acting on suspicions, to use a "fraud suit [ ] itself [as] the vehicle for initially uncovering the fraud." *Gollomp v. MNC Financial, Inc.,* 756 F.Supp. 228, 232 (D.Md.1991). Thus, to state a claim under § 10(b) and Rule 10b–5 promulgated thereunder, Plaintiffs must sufficiently allege and, ultimately prove, that (1) Defendants made a false statement or omission of material fact (2) with scienter (3) upon which the Plaintiffs justifiably relied (4) that proximately caused Plaintiffs' damages. *Hillson Partners Ltd. Partnership v. Adage, Inc.,* 42 F.3d 204, 208 (4th Cir., 1994).

 If Plaintiffs fail to state a claim against Cryomedical under § 10(b) and Rule 10b–5, they likewise fail to state a claim against the individual defendants as controlling persons. *Malone v. Microdyne Corp.,*

---

mentality or interstate commerce or of the mails or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operates as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1992).

**14.** Section 20(a) provides:

(a) Every person who, directly or indirectly, controls any person liable under any provision of this Chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

824 F.Supp. 65, 66 n. 1 (E.D.Va.1993), *rev'd on other grounds,* 26 F.3d 471 (4th Cir.1994). Moreover, it is not enough that Plaintiffs make blanket allegations against the individual defendants; they must attribute specific statements to specific defendants. *See Juntti v. Prudential–Bache Sec., Inc.,* 993 F.2d 228 (4th Cir., 1993).

■ Since Plaintiffs attempt to establish liability against the individual defendants based on their alleged status as controlling persons within the meaning of § 20(a), Plaintiffs must allege also that: 1) the individual defendants had the power to control or influence Cryomedical, and 2) that they, in some meaningful sense, were culpable participants in Cryomedical's alleged illegal activity. *See In re Alpha 1 Biomedicals, Inc. Securities Litigation,* 94–1138, slip op. at 8 (D.Md., March 13, 1995) (citing *Carpenter v. Harris, Upham & Co.,* 594 F.2d 388, 394 (4th Cir.), *cert. denied,* 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979); *Walker v. Cardinal Sav. & Loan Ass'n,* 690 F.Supp. 494, 500 (E.D.Va. 1988)).

■ Here, the Court is required to consider whether Defendants omitted information about the Urethral Warmer and AccuProbe and, if so, whether those omissions were material. In *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Supreme Court held that for an omission, to be actionable under § 10(b) and Rule 10b–5, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 231–32, 108 S.Ct. at 983 (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)); *Adage,* 42 F.3d at 209. Under this fact-specific inquiry, the Court does not view each statement or omission in a vacuum without consideration to the total mix of information Cryomedical made available. *Basic Inc.* 485 U.S. at 240, 108 S.Ct. at 988. Rather, the Court has a duty to consider the nondisclosures in light of all the other information made available to the Plaintiffs.

Moreover, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know the fact." *In re Time Warner Inc. Securities Litigation,* 9 F.3d 259, 267 (2nd Cir.1993). "The role of the materiality requirement is not to attribute to investors a childlike simplicity but rather to determine whether a reasonable investor would have considered the omitted information significant at the time." *Adage,* 42 F.3d at 213 (citing *Basic Inc.,* 485 U.S. at 232–34, 108 S.Ct. at 983–85) (internal quotation marks omitted). Thus, there is no duty to disclose information of common knowledge, Murphy's Law or Peter Principle or obvious results. *Id.* at 214 (internal citations omitted). "The market has risks; the securities laws do not serve as investment insurance." *Raab v. General Physics Corporation,* 4 F.3d 286 (4th Cir. 1993). Since "[s]ecurities laws do not guarantee sound business practices[,] .... [i]nvestors seeking relief under Rule 10b–5 have to distinguish their situation from that of many others who are adversely affected by business reverses." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) (internal citations omitted).

■ Where, as here, Plaintiffs allege material omissions, the materiality of information claimed not to have been disclosed is not enough to sustain a fraud claim. Nondisclosure "absent a duty to disclose, is not misleading under Rule 10b–5." *Basic Inc.,* 485 U.S. at 239 n. 17, 108 S.Ct. at 987 n. 17. Under Rule 10b–5, corporations are required to disclose only when their silence would make other statements misleading. *Taylor v. First Union Corp.,* 857 F.2d 240, 243–44 (4th Cir.1988).

■ Because Plaintiffs make allegations of fraud, they must also meet the requirements of Fed.R.Civ.P. 9(b) by stating the circumstances which constitute fraud with particularity. They satisfy this requirement when their allegations provide the Defendants with fair notice of plaintiff's claims by detailing the time, place, speaker and contents of the allegedly fraudulent statements. *See Gollomp,* 756 F.Supp. at 232. However, "[m]ere allegations of fraud by hindsight will not satisfy the requirements of Rule 9(b)." *Ad-*

*age,* at 209 (internal quotation marks and citations omitted). Moreover,

> [a]lthough lengthy quotations from statements from the Defendants may provide quite specific information as to time, place, content, and speaker, such technical compliance does not satisfy rule 9(b)'s edict in the securities fraud context.... [R]ule 9(b) requires that the complaint set forth the facts on which the belief is founded ...

*Borow v. nVIEW Corp.,* 829 F.Supp. 828, 833 (E.D.Va.1993) (quoting *In re First Chicago Corp. Sec. Litig.,* 769 F.Supp. 1444, 1453 (N.D.Ill.1991)).

The complaint must also set forth allegations of scienter. "Without allegations sufficient to permit an inference of recklessness or intent to deceive, a claim for fraud cannot lie." *Quest Medical, Inc. v. Kirschner Medical Corp.,* Civil Action No. WN–90–858, 1992 WL 311193, at *4 (D.Md.1992). In order to satisfy the scienter requirement, Plaintiffs must allege

> a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Hanon v. Dataproducts Corp.,* 976 F.2d 497, 507 (9th Cir.1992) (internal quotation marks and citations omitted). Plaintiffs must provide a basis for inferring that the Defendants' conduct was fraudulent. *See Quest Medical,* 1992 WL 311193, at *9.

B. *Analysis*

Against the aforementioned standards, the Court will now address Plaintiffs' allegations. Plaintiff's fraud allegations stem from statements all Defendants made, or failed to make, as early as 1991. Since Plaintiffs bring this suit against the Corporation and, thus the shareholders themselves, the Court must carefully and thoroughly analyze broad allegations of fraud. *See Borow,* 829 F.Supp. at 833 (citing *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 742–43, 95 S.Ct. 1917, 1929, 44 L.Ed.2d 539 ("in this type of litigation, [ ] the mere existence of an unre-solved lawsuit has settlement value to the plaintiff not only because of the possibility that he may prevail on the merits, ... but because of the threat of extensive discovery and disruption of normal business activities which may accompany a lawsuit which is groundless in any event.")).

*Fiscal Year Ended 1991*

Plaintiffs allege that Cryomedical's 1991 10–K, filed with the SEC on September 13, 1991, "contained no suggestion that separate FDA approvals would be required for any of the AccuProbe's accessories." (Paper No. 10, ¶ 34). They further allege that the 1991 Annual Report, filed with the SEC on January 6, 1992, was devoid of any information suggesting that in order for surgeons at Allegheny Hospital to use the AccuProbe prototype in prostate cancer surgery, they used a urethral heating device which had not received § 510(k) clearance. These omissions, Plaintiffs allege, were fraudulent.

■ The Defendants counter by arguing that, immediately after the Company, in its 1991 10–K, described that the AccuProbe had received 510(k) clearance for commercial marketing, it referred its readers to the section entitled "Governmental Regulation." There, Defendants argue, that Cryomedical thoroughly described the impact of governmental regulations regarding the Company's products. The Court agrees.

In the Governmental Regulation section, Cryomedical wrote

> The development, production, testing, manufacturing, and marketing of the CMS AccuProbe, the Solutions, and related instrumentation requires regulatory review and/or approval by the United States Food and Drug Administration (the "FDA"). ... There can be no assurance that regulatory approvals or clearances will be obtained for any of the intended applications of the Company's proposed technologies once developed.
>
> \* \* \* \* \* \*
>
> The Company will market its AccuProbe and seek to market its Solutions for organ preservation pursuant to a Section 510(k) premarket notification. In this connection,

in April 1991, the FDA accepted the Company's 510(k) premarket notification with respect to the AccuProbe.

\* \* \* \* \* \*

There can be no assurance that any required FDA or other regulatory approval will be granted or, if granted, will not be withdrawn. Governmental regulation may prevent or substantially delay the marketing of products, cause the Company to undertake costly procedures, and thereby furnish a competitive advantage to more substantially capitalized companies with which the Company may compete.

(Paper No. 15, Exh. A).

Plaintiffs' argument that the 1991 10–K contains no suggestion that separate FDA approvals would be required for any of the AccuProbe's accessories is technically correct. However, 1991 10–K quite candidly reads that related instrumentation requires regulatory review and/or approval by the FDA. The Court finds that Plaintiffs' argument, as to the 1991 10–K, lacks merit.

■ Plaintiffs' argument with respect to the 1991 Annual Report is also without merit. Plaintiffs agree that in 1991, Cryomedical was a "development stage company." The Company had just completed development of the AccuProbe. In its 1991 10–K, Cryomedical described the regulatory status of the AccuProbe as follows:

Although the AccuProbe and the Solutions have been tested in laboratory settings, development of products for commercial application has not been completed. The Company anticipates completion of initial development of the AccuProbe later in 1991, but there can be no assurance in that regard....

(Paper No. 15, Exh. A). Similarly, in a letter dated December 1, 1991 and included in the 1991 Annual Report, Finkelstein wrote:

On April 11, 1991, the AccuProbe received 510(k) premarket clearance from the U.S. Food and Drug Administration. As a matter of note, ninety percent of all medical devices in the U.S. are commercially marketed and sold under 510(k)s. With FDA clearance, an important mile-

stone was accomplished bringing us one step closer to commercialization.

... Moreover, the Company delivered the final prototype of the device to Allegheny General Hospital in late October. Since that time, surgeons at Allegheny General have been utilizing the CMS Accu-Probe on patients with prostate and liver cancer on a daily basis.

In the 1991 Annual Report Cryomedical also wrote:

The AccuProbe is engineered to utilize proprietary disposable tips and accessories commonplace within today's operating room environment. The disposables offer two distinct advantages: increased patient and physician safety and an ongoing revenue stream for the Company.

(Paper No. 15, Exh. D).

While it is true that the report did not detail Allegheny Hospital's surgical techniques in using the AccuProbe, it is equally true that the AccuProbe, at this time, was nothing more than a prototype, a developmental product being tested by and awaiting evaluation and assessment from the medical community. At this developmental stage, the Defendants were not required to look into their crystal balls and predict the type of surgical techniques or applications that surgeons would use along with the AccuProbe. Quite simply, "an inability to foresee the future does not constitute fraud." *Adage*, 42 F.3d at 213 (quoting *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1132 (7th Cir.1993)).

Examining the total mix of information available for fiscal year ended 1991, the Court does not believe that Defendants' failure to come forward with information regarding a urethral warming device was fraudulent. A careful review of Cryomedical's 1991 10–K suggest that the Company's primary concern was ensuring the medical community that it had successfully combatted previously identified problems with cryosurgery. Thus, in its 1991 10–K, Cryomedical wrote:

Cryosurgery is a surgical procedure that uses freezing temperatures to destroy tissue by circulating a refrigerant through the tip of a cryoprobe inserted directly into

the tissue to be destroyed. Until recently, there were three major problems that hindered the efficient application of cryosurgery to the treatment of cancer and other undesirable tissue. First, surgeons had been unable to observe the extent of the frozen region during cryosurgery; second, there had been inadequate understanding of the mechanism by which tissue is destroyed during freezing; and third, instrumentation had not progressed to take full advantage of newly developed techniques addressing the first two problems.

In order to correct the first major problem, a number of surgeons have recently applied ultrasound imaging techniques during surgery to determine both the extent of a tumor and the extent of the tissue frozen during cryosurgery. The Company anticipates that the use of these ultrasound techniques will allow the more effective use of cryosurgery for the above indicated treatments.

With respect to the second major problem, advances have been made in the understanding of the mechanism by which tissue is destroyed during freezing and the effects of various low temperatures on such tissues. It is due to this new understanding that Drs. Boris Rubinsky and Gary Onik, both of whom are consultants to the Company, have been engaged in research and development of the CMS AccuProbe system.

The Company believes that it has addressed the third major problem by developing the AccuProbe, a cryosurgical system which the Company believes will enable surgeons to more precisely and efficiently destroy many cancerous tumors. All right, title and interest in and to the AccuProbe have been assigned to the Company in connection with the acquisition of CII.

\*　　\*　　\*　　\*　　\*　　\*

... Cryosurgery has a number of advantages over other treatment options for malignant liver tumors. First, unlike surgical resection, cryosurgery does not require removal of large volumes of healthy surrounding tissue. Second, because freezing temperatures can be applied to certain areas and not others, multiple tumors can be treated individually, leave more healthy tissue.

(Paper No. 15, Exh. A).

Perhaps, in retrospect, the Defendants should have identified a fourth problem in the field of cryosurgery and in the development of the AccuProbe: the application of a urethral warming device in prostate cancer surgery. Or, perhaps, Cryomedical lacked insight or was, possibly, negligent by failing to precisely predict the impact that its AccuProbe would have in the area of prostate cancer cryosurgery. However, fraud by hindsight is not actionable.

*Fiscal Year Ended 1992*

Plaintiffs make similar allegations with respect to statements made by the Defendants in, or regarding, fiscal year ended 1992. Specifically, Plaintiffs allege that Cryomedical issued press releases which asserted "that the AccuProbe was a commercial device, which needed no additional regulatory approvals in order to be used for prostate cancer surgery." The June 30, 1992 news release read as follows:

**CRYOMEDICAL SCIENCES, INC. ANNOUNCES SHIPMENT OF CMS ACCUPROBE™ SYSTEMS**

Cryomedical Sciences, Inc. (NASDAQ: CMSI), announced today the first commercial shipment of its CMS AccuProbe™ System, a cryosurgical device used for the treatment of liver cancer and for minimally invasive treatment of prostate cancer.

\*　　\*　　\*　　\*　　\*　　\*

... While it is difficult to predict the scope of market acceptance of a new medical product in its first year roll out, it is the company's goal to deliver between 25 and 35 systems over the next 12 months....

According to J.J. Finkelstein, president and CEO, 'We are obviously excited about shipping the first CMS AccuProbe today and officially entering the commercial market....'

To date over 100 patients have been treated using the CMS AccuProbe System,

including 75 prostate cancer patients and 25 liver cancer patients, among others ...

\* \* \* \* \* \*

CMS received 510(k) premarket clearance from the Food and Drug Administration for the AccuProbe System in April, 1991 and last October announced its first use in patients with cancer of the prostate and liver....

On August 14, 1992, Cryomedical issued another press release, which read, in pertinent part, as follows:

Cryomedical Sciences, Inc. (NASDAQ: CMSI) announced today that following the successful use of its minimally invasive AccuProbe system of cryosurgery recently to treat prostate cancer patients, the University of Texas M.D. Anderson Cancer Center in Houston expects to treat 50 more prostate cancer patients with the AccuProbe system this year. The hospital recently began using AccuProbe cryosurgery to treat prostate cancer patients who initially failed other therapies and are at an advanced state of their disease.

\* \* \* \* \* \*

To date, more than 80 prostate cancer patients around the country have been treated using the new therapy. Urologist at M.D. Anderson expect to provide the procedure to 50 M.D. Anderson prostate cancer patients this year alone.

On or about September 28, 1992, Cryomedical filed with the SEC its 1992 10–K for the fiscal year ending June 30, 1992. The 10–K contained the following:

### General

The Company completed initial development of the AccuProbe in 1992 and has commenced marketing this system to hospitals, surgeons and radiologists in the United States and abroad. The first AccuProbe was shipped in June 1992.

\* \* \* \* \* \*

### The CMS AccuProbe System

In addition, the Company has designed a full complement of disposable accessories for the AccuProbe which are being marketed along with the device....

... In April 1991, the United States Food and Drug Administration (the "FDA") accepted the Company's 510(k) premarket notification for the AccuProbe, thus allowing commercial marketing of the product at the Company's discretion. See "Governmental Regulation."

### Governmental Regulation

The development, production, testing, and marketing of the AccuProbe, the Solutions, and related instrumentation requires regulatory review and/or approval by the United States Food and Drug Administration (the "FDA") and similar health authorities in foreign countries. In April 1991, the FDA accepted the Company's 510(k) premarket notification for the AccuProbe, thus allowing commercial marketing of the product. A significant change or modification in the device could require additional review by the FDA.

\* \* \* \* \* \*

There can be no assurance that any required FDA or other regulatory approval will be granted or, if granted, will not be withdrawn. Governmental regulation may prevent or substantially delay the marketing of products, cause the Company to undertake costly procedures, and thereby furnish a competitive advantage to more substantially capitalized companies with which the Company may compete.

(Paper No. 15, Exh. B).

Plaintiffs contend that the Governmental Regulation section in the 1992 10–K was misleading because "the description indicated that no approvals, beyond the pre-market notification already received, were needed for the AccuProbe or its accessories. Only the Solutions faced the risk of non-approval, according to the [ ] description." They assert that this was another component of the Defendants' fraudulent scheme to inflate Cryomedical's stock price.

(Paper No. 10, ¶ 40, 69).

The Defendants counter by arguing that Cryomedical included in its 1992 10–K the same detailed explanation of the pertinent FDA regulations that it had included in its 1991 10–K. Cryomedical again cautioned

investors that all of its products, including 'related instrumentation' for the Accu-Probe, would 'undergo rigorous review' by the FDA; that the testing and regulatory approval process is costly and time consuming; that FDA approval was not guaranteed; that regulatory approval, once obtained, could be withdrawn; and that governmental regulation might prevent or delay the marketing of the Company's products.

(Paper No. 15, p. 16). The Defendants also assert that Cryomedical informed its readers, in its 1992 10–K, that it expected to incur substantial expenditures and that it "had no operating revenues through June 30, 1992; its sole source of revenues has been interest income." (Paper No. 15, p. 20). It also reported that it sustained in excess of four million dollars in losses, which were much worse than losses it sustained in fiscal year 1991.

The Court notes that Cryomedical continued to refer to its AccuProbe as a "developmental" product. It was continuing to learn information about the AccuProbe from the medical community. While the AccuProbe's status had been elevated from experimental use to general use, Cryomedical had just begun commercial marketing.

Based on the total mix of information, the Court concludes that the Governmental Regulation section contained in the 1992 10–K was not misleading. Immediately following its description of the AccuProbe, Cryomedical directs its readers to the Governmental Regulation section. While Cryomedical informs the reader of the FDA's approval of the AccuProbe, it also states that related instrumentation are subject to FDA approval.

After filing its 1992 10–K, in October, 1992, Cryomedical filed a pre-market notification for its Urethral Warmer. It did not disclose the filing to the public. On November 22, 1992, The New York Times published an article entitled "If Fire Fails Against Cancer, Try Ice" by Lawrence M. Fisher. In the article, Fisher described cryosurgery and the AccuProbe. He emphasized the AccuProbe's usefulness in the area of prostate cancer cryosurgery and added that cryosurgery "is

now limited to men who have already had one of the other treatments." He went on to explain

[b]ecause the prostate is so close to other sensitive organs, like the rectum and the bladder, the surgeon must take care not to freeze any more tissue than necessary. A warmed catheter preserves the urethra, which is surrounded by the prostate.

Cryomedical later included the article in an investor package.

■ On or about February 22, 1993, Cryomedical disseminated its 1992 Annual Report to its shareholders. In a letter to the shareholders, which accompanied the Annual Report and was dated December 31, 1992, Finkelstein wrote:

1992 saw the Company ship the prototype CMS AccuProbe™ system. Later in the year, CMS began shipping the first commercial AccuProbe systems. To date, these systems have been utilized in a minimally invasive cryosurgical procedure in more than 200 prostate cancer cases, as well as in several innovative cancer surgeries targeting the liver, brain, and other organs.

**We are proud that CMS has taken a design concept, developed several prototypical products, obtained FDA marketing clearance, initiated clinical use for the treatment of several major diseases, and manufactured and shipped a commercial product—all within 30 months of the Company's initial public offering in 1989.**

(Emphasis in original). Under the heading "CMS Milestones", Cryomedical remarked that "[t]he Company introduced the CMS AccuProbe system ... at the annual American Urological Association convention.... This event marked the first time a functional, commercial system was displayed."

Plaintiffs contend that when Defendants filed the premarket notification for the Urethral Warmer, they were "aware that if the Urethral Warmer were denied approval, the AccuProbe would be materially less attractive to urologists because of the risk of complications that ensue from prostate cancer cryosurgery performed without the Urethral

Warmer." (Paper No. 10, ¶ 41). They also attack the New York Times article, the subsequent investor package which included the article and the 1992 Annual Report. The Plaintiffs contend that Defendants failed to explain that the Urethral Warmer was needed to perform prostate cancer surgery and that the FDA had not approved it for commercial distribution. (Paper No. 10, ¶ 45).

With respect to the New York Times article and investor package, the Court is without information sufficient to determine whether materials included in the investor package were misleading. The investor package is not among the numerous exhibits provided to the Court. Without that information, and based on the allegations contained in the four corners of Plaintiffs' complaint, the Court concludes that Plaintiffs fail to establish that the investor package, which included the New York Times article, was misleading.

With reference to the 1992 Annual Report, Defendants' maintain that since the Report did not have the effect of inflating the price of Cryomedical's stock, any statements contained therein were not material. The ultimate effect on a company's stock, however, is not the test. Rather, the test is whether "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc.*, at 231–32, 108 S.Ct. at 983. Moreover, under Rule 10b–5, corporations are required to disclose when their silence would make other statements misleading. *Taylor*, 857 F.2d at 243–44.

Here, Cryomedical had completed initial development of the AccuProbe; it had begun commercial shipping of the device; and, at this point, it recognized the AccuProbe's impact in the area of prostate cancer cryosurgery. Thus, in October, 1992, when Cryomedical filed for premarket approval for the Urethral Warmer, and in February, 1993, when Cryomedical filed and disseminated its 1992 Annual Report, it can reasonably be posited that Cryomedical should have informed its investors about the premarket

approval filing and how the filing related to the AccuProbe.

At this stage, Cryomedical was, arguably, in possession of significant information with regard to the Urethral Warmer and, thus, to the AccuProbe. "There is a difference between knowing that any product-in-development may run into a few snags and knowing that a particular product has already developed problems significant" as to warrant full disclosure of the information. *See Borow*, 829 F.Supp. at 834 (citing *In re Apple Computer Securities Litigation*, 886 F.2d 1109 (9th Cir.1989)). The Court does not hold that Cryomedical was required to predict the impact that failure to receive premarket approval for the Urethral Warmer would have on future sales of the AccuProbe. Rather, the Court finds that Plaintiffs have sufficiently alleged that Cryomedical owed a duty to its shareholders and to, then, potential investors to make informative disclosures with respect to one of the AccuProbe's "related instrumentation", thereby giving its shareholders the opportunity to make informed investment decisions.

### Fiscal Year Ended 1993

 Plaintiffs also attack statements made by the Defendants with respect to fiscal year 1993. In its 1993 10–K, filed with the SEC on September 28, 1993, Cryomedical discussed the status of § 510(k) premarket approval for the Urethral Warmer as follows:

### The CMS AccuProbe System

\* \* \*

... The commercial development of the CMS AccuProbe was completed in 1992 and marketing of the AccuProbe commenced. In addition, the Company has designed a full complement of disposable accessories for the AccuProbe which are being marketed along with the device.

### Governmental Regulations

\* \* \*

Accessory devices developed by the Company for use with the CMS AccuProbe system may also require review and clearance or approval by the FDA. In this

connection the Company submitted a 510(k) premarket notification to the FDA in October 1992 for its urethral warmer system, a device used to protect the patient's urethral tissue from the freezing temperatures associated with the cryosurgery of the prostate gland. In January 1993, the FDA requested that the Company supply additional clinical data concerning the safety and efficacy of the device and in August 1993, the Company amended the 510(k) premarket notification to include the data requested, which is now under review by the FDA.

On December 22, 1993, Cryomedical disseminated its 1993 Annual Report to shareholders. In a letter to the shareholders, under the heading "Out of the laboratory, into the marketplace," Finkelstein wrote:

> In 1991, the CMS AccuProbe was granted marketing clearance from the FDA for use on oncology, urology, liver surgery, gynecology and general surgery, among others, permitting surgeons to use the device in these areas. Our system has been in general use, as differentiated from experimental use, since October 1991. Commercial marketing began in 1992.

Cryomedical, under the heading "CMS AccuProbe: The Cutting Edge of Cryosurgery," wrote

> The combination of the CMS AccuProbe and ultrasound technology has created a surgical breakthrough of significant proportions. Prostate cancer cryosurgery, for example, has been used in hundreds of procedures. Guided by transrectal ultrasound images, the surgeon is able to insert the probes percutaneously (through the skin) and precisely target and freeze the cancerous gland. The entire procedure is accomplished without any major incisions. Destroyed tissue is then harmlessly absorbed by the body over time. The result is reduced patient trauma, lower risk of complications, and faster patient recovery.

Plaintiffs attack Cryomedical's 1993 10–K "because it failed to disclose that the most important accessory to the AccuProbe, the Urethral Warmer, was necessary to limit the risks of prostate cancer surgery." Plaintiffs contend that Defendants' failure to make this disclosure constitutes fraud. The Court disagrees.

Based on the total mix of information available to Plaintiffs at this time, they were aware as early as November, 1992, that surgeons used a urethral warming device to prevent freezing any more tissue than necessary in performing prostate cancer surgery. Cryomedical disclosed in its 1993 10–K that the Urethral Warmer was "used to protect the patient's urethral tissue from the freezing temperatures associated with the cryosurgery of the prostate gland." Moreover, the record before the Court simply does not support Plaintiffs' allegation that the Urethral Warmer was a "necessary" accessory to the AccuProbe. The Defendants never promoted the AccuProbe as a device for use with prostate cancer surgery only. They emphasized the AccuProbe's applications in many areas in the field of cryosurgery. While the medical community used the AccuProbe for prostate cancer surgery more than any other types of surgery, Plaintiffs, not Defendants, are responsible for gathering and evaluating all available information in making an investment decision.

While Cryomedical, in its 1993 10–K, disclosed that it had submitted a 510(k) premarket notification for the Urethral Warmer, Plaintiffs contend that Cryomedical used misleading statements because it failed to predict the effect that non-approval of the 510(k) would have on the sales of the AccuProbe. The Court believes that this argument is without merit. Under § 10(b) and Rule 10b–5, companies are not required to predict the future. Had Cryomedical attempted to predict the effect that non-approval of the Urethral Warmer would have on AccuProbe sales, and those predictions proved false, Plaintiffs or others would attack on the basis that the predictions were misleading.

Plaintiffs also contend that Cryomedical knew in 1993 that its 510(k) for the Urethral Warmer would not be approved and that Cryomedical did not divulge this information until 1994. They rely on press releases Cryomedical subsequently issued on January 17, and February 4, 1994 to imply that Defendants knew all along that the FDA would

not grant premarket approval for the Accu-Probe. This is fraud by hindsight at its best and is not actionable under the securities laws.

A careful review of the record indicates that in 1993 the FDA merely requested additional information regarding the Urethral Warmer. Plaintiffs plead no facts, other than including statements from the 1994 press releases, which would lead the Court to believe that Cryomedical knew prior to FDA's official denial that a denial would be forthcoming. Even if Cryomedical had suspicions, the securities laws do not require the disclosure of suspicions.

### Cryomedical's Promotion Materials

Plaintiffs also make various allegations with respect to the FDA's warning regarding Cryomedical's promotional materials for the AccuProbe. The controversy arises from Cryomedical's use of "treatment" in its promotional materials. Yet, based on all the information before the Court, the Court does not believe that a reasonable investor would find this information material. Moreover, Plaintiffs, from the inception, were aware from statements that Cryomedical issued in each one its 10–K's that the regulatory process of a new product is ongoing and without guarantees.

### Controlling Persons Liability

 Finally, Plaintiffs argue that the individual defendants are liable under § 20(a) as controlling persons. Rather than allege facts sufficient to establish § 20(a) liability, Plaintiffs begin by emphasizing Defendants' positions within the Company and their stock ownership. Thereafter, Plaintiffs assume that the individual defendants are controlling persons, and fail, with the exception of Finkelstein's statements, to distinguish individual acts. First, neither status nor position, in and of themselves, are sufficient for § 20(a) liability. *See Wool v. Tandem Computers, Inc.,* 818 F.2d 1433 (9th Cir.1987). Second, Plaintiffs' "aggregation of defendants without specifically alleging which defendant was responsible for which act" is impermissible and the Complaint against the individual defendants must be dismissed. *Juntti,* 993 F.2d 228 (citation omitted).

 The Court has examined the statements that Plaintiffs tie to Finkelstein. The Court does not find in any of Finkelstein's communications the type of statements that arise to the level of fraud. At most, Finkelstein made hopeful statements about the AccuProbe's potential success. Moreover, when the Company failed to secure FDA approval for its Urethral Warmer, Finkelstein made mere predictions about the effect the non-approval would have on the sales of the AccuProbe. "Vague, open-ended predictions and similar 'soft' statements lack the requisite materiality to bring on securities fraud liability." *Raab v. General Physics Corp.,* 1993 WL 358450 1993 U.S.Dist. LEXIS 17443 (D.Md., January 7, 1993).

### Scienter

 Plaintiffs emphasize that the individual Defendants sold much of their stock throughout the class period. "Insider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter." *In re Apple Computer Securities Litigation,* 886 F.2d at 1117. Plaintiffs further allege that

> Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts even though such facts were available to them. Defendants' misrepresentations and omissions were intentional or reckless and done for the purpose of enriching themselves at the expense of Plaintiffs and the Class and to conceal Cryomedical's true business prospects from the investing public.

(Paper No. 10, ¶ 66). At this stage, while the Court has some reservations as to Plaintiffs' ability to sustain their scienter allegations, it believes that Plaintiffs have sufficiently alleged scienter as to survive Defendants' motion to dismiss. Again, Plaintiffs have sufficiently alleged fraud against Cryomedical in two areas only: (1) failure to disclose, in October 1992, that it had filed for FDA § 510(k) approval for its Urethral Warmer; and (2) failure to disclose in its 1992 Annual

Report the relationship between the Urethral Warmer and the AccuProbe.

### Negligent Misrepresentation

■ Here, Plaintiffs' claim for negligent misrepresentation stems from their alleged economic losses. Plaintiffs allege that by their alleged misrepresentations, the Defendants induced them into purchasing Cryomedical's common stock at inflated prices. (Paper No. 10, ¶ 81). Since Plaintiffs allege that Defendants' negligent misrepresentations creates a risk of loss, they must also allege an "intimate nexus" between themselves and Defendants. *See PPM America, Inc. v. Marriott Corp.*, 820 F.Supp. 970, 979 (D.Md.1993); *see also, In re Medimmune, Inc.*, 873 F.Supp. 953, 969 (D.Md., 1995).

"This intimate nexus may be satisfied by contractual privity or its equivalent." *PPM America*, 820 F.Supp. at 979. In determining whether an intimate nexus exist, courts have considered who the defendant, in making the alleged misrepresentations, intended to reach. *See id.* (citing *Tischler v. Baltimore Bancorp*, 801 F.Supp. 1493 (D.Md. 1992)). Where the alleged misrepresentations were included in press releases and documents filed with the SEC, courts have concluded that an intimate nexus is lacking. *See In re Medimmune, Inc.*, 873 F.Supp. at 969; *In re Alpha 1 Biomedicals, Inc.*, slip op. at 15; *PPM America*, 820 F.Supp. at 979; *Tischler*, 801 F.Supp. at 1505. Such is the case because when defendants make statements aimed at the general universe rather than an identifiable group, no duty of care arises. *Jacques v. First National Bank*, 307 Md. 527, 534–35, 515 A.2d 756 (1986).

Here, Plaintiffs rely on statements Defendants made in press releases, Annual Reports and Form 10–K's filed with the SEC. Yet, Defendants aimed these communications at the general public and not any identifiable group of individuals. Plaintiffs have failed establish an intimate nexus between themselves and the Defendants and their claim for negligent misrepresentation must fail. *See Tischler*, 801 F.Supp. at 1505 ("such an intimate nexus cannot exist unless a defendant is aware of a specific party or class of parties which intend to rely upon defendant's state-

ment") (citing *Brickman v. Tyco Toys, Inc.*, 722 F.Supp. 1054 (S.D.N.Y.1989)).

### Leave to Amend

The Plaintiffs have had three opportunities to establish fraud against the Defendants. Yet, they have failed to cure deficiencies in their pleadings. Accordingly, the Court will deny Plaintiffs' request for leave to amend. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). The Court will so order.

## CONCLUSION

Plaintiffs brought this complaint against Defendants two days after Cryomedical disclosed adverse FDA actions, with respect to the Company's only commercial product—the AccuProbe—to the investing public. Plaintiffs have alleged that Cryomedical's stock price "plummeted" as a result of the announcement. They have also inferred that Cryomedical's only intended purpose for the AccuProbe was to perform prostate cancer surgery. However, these allegations are without merit.

Accordingly, for the foregoing reasons, the Court will dismiss, with prejudice, Plaintiffs' complaint against all individual defendants. The Court also finds that Plaintiffs failed to sufficiently allege fraud for any statements made by the Defendants, with the exception of the Company's failure to disclose that it had filed for FDA approval for its Urethral Warmer. The Court further finds that Plaintiffs have sufficiently alleged that Cryomedical made inadequate disclosures in its 1992 Annual Report with regard to the AccuProbe and its "related instrumentation", the Urethral Warmer.

Because Plaintiffs failed to establish an intimate nexus between themselves and the Defendants, the Court will also dismiss, with prejudice, Plaintiffs' claim for negligent misrepresentation. The Court will so order.

## ORDER

For the reasons set forth in the attached Memorandum Opinion, IT IS this 26th day of April, 1995, by the United States District

Court for the District of Maryland, Southern Division, hereby **ORDERED** that:

1. Defendants' Motion to Dismiss BE, and the same hereby IS, **DENIED IN PART and GRANTED IN PART;**

2. Defendants' Motion to Dismiss BE, and the same hereby IS, **DENIED** with respect to Cryomedical's failure to disclose to the investing public, in October, 1992 that it had filed for FDA § 510(k) approval for its Urethral Warmer;

3. Defendants' Motion to Dismiss BE, and the same hereby IS, **DENIED** with respect to Cryomedical's failure to disclose in its 1992 Annual Report the relationship between the Urethral Warmer and the Accu-Probe;

4. Defendants' Motion to Dismiss BE, and the same hereby IS, **GRANTED,** without leave to amend, with respect to all other alleged misleading statements and omissions in the Consolidated Amended Class Action Complaint;

5. Defendants' Motion to Dismiss BE, and the same hereby IS, **GRANTED,** without leave to amend, with respect to any and all claims against the individual defendants, Finkelstein, Carl and Breslow;

6. Defendants' Motion to Dismiss BE, and the same hereby IS, **GRANTED,** without leave to amend, with respect to Count III, Negligent Misrepresentation Against All Defendant's, of Plaintiffs' Consolidated Amended Class Action Complaint;

7. Defendant Cryomedical is directed, within ten (10) days of the date of this Order, to file an answer to Plaintiffs' claims in their Consolidated Amended Class Action Complaint determined by the Court as sufficient allegations of fraud under § 10(b) and Rule 10b–5 promulgated thereunder.